[No. 36114.  Department One.  July 12, 1962.]

THE STATE OF WASHINGTON, *Respondent*, v. IRENE SULLIVAN, *Appellant.**

*Reported in 373 P. (2d) 474.

*Stanley L. Conroy,* for appellant.

*Arnold R. Zempel* and *Jack N. Bishop,* for respondent.

WEAVER, J.—A jury found Mrs. Irene Sullivan guilty of murder in the first degree. She appeals from a judgment and sentence committing her to the state penitentiary for the remainder of her natural life.

Two days after defendant's husband purportedly went fishing, she reported him missing. January 19, 1961, some four weeks later, Mr. Sullivan's body and fishing gear were exhumed by members of the Snohomish county sheriff's office from a flower bed on land occupied by Mr. and Mrs.

Sullivan's house trailer. Mr. Sullivan had been shot through the right temple.

In support of her contention that she did not receive a fair trial, defendant makes four assignments of error that may be grouped in two categories: (1) it was error for the trial court to require defense counsel to testify for the state; and (2) it was error to permit Paulus Vanderwielen, M.D., to testify concerning confidential statements defendant made while under his observation, examination, treatment and care in Northern State Hospital, where she had been sent by an order of court.

I.

A. *Privileged Communication Between Attorney and Client.*

Prior to the discovery of Mr. Sullivan's body, defendant consulted Stanley L. Conroy, a member of the bar of this state. He subsequently defended Mrs. Sullivan on the charge of first-degree murder.

After the state had examined 17 witnesses, the prosecuting attorney called defense counsel to the witness stand. Surprise could not have been claimed. Mr. Conroy was named on the list of state witnesses filed by the prosecuting attorney, pursuant to RCW 10.37.030. In addition, the deputy prosecuting attorney said in his opening statement: "We will have Mr. Conroy on the stand . . ." He then outlined evidence the state would adduce from Mr. Conroy.

Introductory to later objections, defense counsel testified:

"Q. On the 18th day of January, 1961 did you call Robert Twitchell, the sheriff of this county? A. Yes, sir, I think it was the 18th. I called him one evening, at any rate. Q. And do you recall what it was about that you were calling him? A. Yes, I had some information that I thought would be of value. Q. And what was that information? A. It was regarding a missing person. Q. And who was the missing person? A. The missing person was Lloyd Sullivan. . . . Q. . . . What did you inform Mr. Twitchell as to Lloyd Sullivan."

In the absence of the jury, defense counsel objected to this line of questioning on two grounds: (1) it involved

privileged communication between attorney and client; and (2) it was hearsay.

The trial court sustained the objection to conversations between defense counsel and Sheriff Twitchell, but overruled the objection that a privileged communication was involved.

Thereafter, defense counsel testified:

"Q. Mr. Conroy, on the 18th day of January, 1961, did you give information to the sheriff of Snohomish County as to where the body of Lloyd Sullivan was? A. More or less, in an indirect way, I did. Q. Where it might be found? A. Where it might be, yes, uh-huh. Q. Then, the following morning did you again see Mr. Twitchell? A. Yes. Q. And the following morning you accompanied Mr. Twitchell to the Sullivan trailer, or to the Sullivan Property, did you not? A. Yes, Sir. About twenty people, I would say, went."

RCW 5.60.060 provides, in part:

"The following persons shall not be examined as witnesses:

" . . .

"(2) An attorney or counselor shall not, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon in the course of professional employment. . . ."

In *State v. Emmanuel*, 42 Wn. (2d) 799, 815, 259 P. (2d) 845 (1953), this court said:

"The same privilege accorded the attorney is extended to the client under the common-law rule. *State v. Ingels,* 4 Wn. (2d) 676, 104 P. (2d) 944. (Certiorari denied. 311 U. S. 708, 85 L. Ed. 460, 61 S. Ct. 318.) Such statutes are merely declaratory of the common law. 58 Am. Jur., Witnesses, § 463."

The privilege is that of the client and only he can waive it. *State v. Ingels, supra*; *State v. Emmanuel, supra*. Although a third party overhearing a conversation between an attorney and client may testify, the attorney is not thereby qualified. *Hartness v. Brown,* 21 Wash. 655, 59 Pac. 491 (1899); *State v. Falsetta,* 43 Wash. 159, 86 Pac. 168 (1906).

Although a client's communications to his lawyer are not confidential or privileged when conveyed to counsel for the

purpose of public disclosure (*Green v. Fuller,* 159 Wash. 691, 294 Pac. 1037 (1930)), the gravity of the charge in the instant case, and the character of the evidence sought do not permit the inference that Mrs. Sullivan consulted defense counsel for the purpose of having him disclose the nature of her communication. In fact, the contrary appears.

The following occurred in the absence of the jury:

"[Q.] Mr. Zempel: . . . Did your client ask you to give the sheriff this information? [A.] Mr. Conroy: My client didn't even know what she was doing when I talked to her. Mr. Zempel: That is not answering the question. Mr. Conroy: Of course she didn't. She belonged in the hospital when I talked to her. It is obvious."

■ We believe it immaterial that the lawyer, when called upon to testify, was questioned concerning what he told others, but was not questioned concerning the confidential communication of his client to him. If the former must be *obviously* based upon the latter, the client's privilege prohibits the attorney from testifying.

"The rule as to privileged communications between attorney and client applies regardless of the manner in which it is sought to put the communications in evidence, whether by direct examination, cross-examination, or *indirectly as by bringing out facts brought to knowledge solely by reason of a confidential communication.*" 58 Am. Jur., Witnesses § 466, p. 262. (Italics ours.)

■ The prosecuting attorney could have had only one intent and purpose when he called defense counsel as a state witness: to prejudice the jury by giving it an opportunity to draw the inescapable inference that defendant had told defense counsel where she had buried her husband's remains. This was privileged under the statute, and it was prejudicial error to force Mr. Conroy to testify concerning it.

B. *Defense Counsel as State Witness.*

The second facet of defense counsel's testimony presents a question that is not susceptible of categorical answer, but one that, on a retrial of this case, may be presented to the trial court.

Following Mr. Conroy's previous testimony, the prosecuting attorney examined Mr. Conroy at length on his participation in the search for Mr. Sullivan's body January 19, 1961; whether he took part in the search of the trailer house; what he had seen; what was found; discovery of the gun; uncovering of the body; identification of numerous exhibits, including photographs taken at the scene—one showing the presence of defense counsel.

Although the evidence was not cumulative at the time Mr. Conroy was called as a witness, it became repetitious by the end of the trial, for everything to which defense counsel testified was established with particularity by numerous other witnesses.

We recognize, and do not wish to change or modify, the rule that a lawyer in a cause is not disqualified as a witness; his testimony is admissible, if otherwise competent. *Ryan v. Ryan,* 48 Wn. (2d) 593, 599, 295 P. (2d) 1111 (1956).

In at least two prior decisions, this court has recognized the right of the prosecuting attorney to call defense counsel as a witness. *State v. Cresto,* 130 Wash. 436, 227 Pac. 856 (1924); *State v. Allgood,* 50 Wn. (2d) 618, 313 P. (2d) 695 (1957).

In the *Cresto* case, *supra,* husband and wife were being tried jointly. The state believed it had not sufficiently identified appellant's wife as the person who had previously been convicted in justice court on another charge. The state called defense counsel, the former prosecuting attorney, as a witness to furnish the identification. This court said:

" . . . The state had a right to make the necessary proof in any way it saw fit, and the mere fact that it made it through a person who happened at the time to be appellant's attorney cannot alter the situation nor make the testimony improper. Besides, all this part of the proceeding was with reference to the action against appellant's wife and did not touch him, and it is difficult for us to see how the matters complained of here could have been prejudicial to him."

In the *Allgood* case, *supra,* defense counsel had notarized an affidavit signed by his client. It was not error for the

court to permit defense counsel to identify the signature, for a notary public ". . . may not refuse to prove the authenticity of signatures so notarized." (p. 620)

Neither case is directly in point on the question now before us. In the first, defendant's rights were not invaded; in the second, the evidence concerned the authenticity of proof.

As we pointed out in *Ryan v. Ryan, supra,* when trial counsel is a witness, except as to merely formal matters, he stakes his oath and word against the oath of his client's adversary. This is true whether he testifies with consent of his client or under compulsion, as in the instant case.

" . . . When this occurs, he [counsel] becomes something more, in the eyes of the court or jury, than a professional representative of his client's interests." *Ryan v. Ryan, supra.*

If defense counsel is required to testify under compulsion, it might well be that defendant's right to complete and unhampered representation is invaded. Balanced against this, however, is the possibility that defense counsel's testimony is necessary to the state's case in the interest of justice and for the protection of the public.

Rule of Pleading, Practice and Procedure, 43.12W, RCW Vol. 0, and Canon of Professional Ethics, 19 RCW Vol. 0, must be considered in this delicate situation.

The rule provides:

"If an attorney shall offer himself as a witness [which he did not do in the instant case] on behalf of his client and give evidence on the merits, he shall not argue the case to the jury, unless by permission of the court."

The canon provides:

"When a lawyer is a witness for his client [which he was not in the instant case], except as to merely formal matters, such as the attestation or custody of an instrument and the like, he should leave the trial of the case to other counsel. Except when essential to the ends of justice, a lawyer should avoid testifying in court in behalf of his client."

Applied to a civil case, we said in *Ryan v. Ryan, supra:*

" . . . should a breach of a canon of professional conduct be so flagrant that it can be said, as a matter of law,

that the breach prevented a fair trial, *a court should not hesitate to hold such breach of conduct prejudicial error and grant a new trial.* . . ." (p. 600) (Italics ours.)

In *State v. Fackrell*, 44 Wn. (2d) 874, 271 P. (2d) 679 (1954), the situation was the reverse of the instant case. A deputy prosecuting attorney testified concerning the validity of defendant's confessions. Thereafter, he did not participate in the trial of the case nor argue it to the jury. Although not a point of decision, the opinion is meaningful, for it recognizes that a defendant's rights in a criminal case *may,* in certain circumstances, be affected by a violation of the rule of court and canon of professional ethics.

At least a portion of the rationale of the rule of court and canon of professional ethics is brilliantly illustrated by the record before us. The short, ineffectual cross-examination of defense counsel *by himself* is in sharp contrast to his cross-examination of other witnesses.

▉ Defense counsel did not breach the rule or canon; nor can we say that the prosecuting attorney breached them. There must always be a sensitive balance between the right of the state to prove its case, in the best manner possible, and the right of the accused to have unhampered and effective representation, especially when on trial for his life.

Applying this reasoning to the facts of the case before us, we find, from a survey of the record, that Mr. Conroy's testimony became repetitious and not necessary to the state's case in the interest of justice and the protection of the public. This tilts the balance in defendant's favor. Defense counsel's presence, as an unwilling witness for the state, rendered his services less effective and invaded the accused's right to unhampered representation at the trial.

We do not decide whether Mr. Conroy, if he is defense counsel upon a retrial of this case, can or cannot be called as a witness for the state; that depends upon circumstances existing at the time. In view of the fact, however, that approximately 20 officials took part in the search of the Sullivan's trailer house and premises and were present when Mr. Sullivan's body was exhumed, it is difficult to imagine

that Mr. Conroy's testimony would be necessary to prove those facts.

## II.

A. *Privileged Communication Between Physician and Patient.*

January 20, 1961—the day after Mr. Sullivan's body was exhumed—the court commissioner of Snohomish County entered an order

" . . . that Northern State Hospital at Sedro Woolley, Washington, be and is hereby designated as the detention ward for the detention, observation and *treatment* of the above named [Irene Sullivan] (Snohomish County not having any observation ward or county hospital), and the said Irene Sullivan is committed thereto for a period not exceeding sixty (60) days for such observation, examination and *treatment, and it is requested that a report be made by said hospital on the alleged mental illness of the said Irene Sullivan.*" (Italics ours.)

The order was entered at the request of Mr. Conroy on the recommendation of two physicians, pursuant to RCW 71.02.

After her confinement in Northern State Hospital, Irene Sullivan was returned to Snohomish County. The hospital reported that she "has never been psychotic any time during her life." Thus, the purpose of the order was accomplished.

While at the hospital, defendant was under the care, observation, and treatment of Paulus Vanderwielen, M.D., a psychiatrist, employed by the state. He was one of her attending physicians. The transcript on appeal contains a 36-page, single-spaced typewritten report, most of which was purportedly made by Dr. Vanderwielen on defendant's physical and mental condition while she was in the hospital.

Dr. Vanderwielen was called as a witness for the state. Over strenuous objections, the court permitted him to repeat statements made by defendant to him during her psychiatric examinations and treatments. It is not necessary that we detail the doctor's testimony. It is sufficient to state that his testimony, if believed by the jury, supported the state's case.

We emphasize that insanity is not a defense in the instant case, nor is the mental competency of Irene Sullivan to stand trial an issue.

Defendant's remaining assignments of error present one question: At the trial of defendant on the charge against her, was it error to permit Dr. Vanderwielen, a state-employed psychiatrist, to testify to statements defendant made to him in the course of psychiatric examination and treatment in a state mental hospital?

Three statutes must be considered:

(1) RCW 5.60.060(4): "A regular physician or surgeon shall not, without the consent of his patient, be examined in a civil action as to *any information* acquired in *attending such patient*, which was necessary to enable him to prescribe or act for the patient." (Italics ours.)

(2) RCW 10.58.010: "The rules of evidence in civil actions, so far as practicable shall be applied to criminal prosecutions."

(3) RCW 10.52.020: "Witnesses competent to testify in civil cases shall be competent in criminal prosecutions, but regular physicians or surgeons, clergymen or priests, shall be protected from testifying as to confessions, or information received from any defendant, by virtue of their profession and character; . . ."

*State v. Miller,* 105 Wash. 475, 178 Pac. 459 (1919), firmly establishes, in this jurisdiction, the rule that the doctor-patient privilege applies in criminal proceedings under the statutes quoted *supra*. The privilege is for the benefit of the patient, to the end that he will be encouraged to disclose his ailments to a physician so that he may receive proper treatment. *State v. Fackrell,* 44 Wn. (2d) 874, 877, 271 P. (2d) 679 (1954), and cases cited.

On the other hand, a forensic examination by a physician is not within the statutory testimonial prohibitions of the doctor-patient privilege. *State v. Winnett,* 48 Wash. 93, 92 Pac. 904 (1907); *State v. Thomas,* 1 Wn. (2d) 298, 95 P. (2d) 1036 (1939); *State v. Fackrell, supra.* The reasons are: the relationship of doctor and patient does not exist; the examination is not for the purpose of treatment, but for

the publication of results. In *Strafford v. Northern Pac. R. Co.,* 95 Wash. 450, 453, 164 Pac. 71 (1917), this court said:

" . . . In order to render a physician incompetent, the information which he is called upon to disclose must have been acquired while he was attending the patient in a professional capacity for the purpose of treating her ailments; there is no privilege when the examination is made by the physician for the express purpose of publishing the results —such, for example, as testifying in an action for personal injuries. . . ."

See also: *Randa v. Bear,* 50 Wn. (2d) 415, 312 P. (2d) 640 (1957).

In *Ballard v. Yellow Cab Co.,* 20 Wn. (2d) 67, 72, 145 P. (2d) 1019 (1944), the court quoted with approval from *Smart v. Kansas City,* 208 Mo. 162, 105 S. W. 709, 123 Am. St. 415, 13 Ann. Cas. 932, 14 L. R. A. (N. S.) 565, as follows:

" 'It is not necessary in order to create the relation of physician and patient that he should actually treat the patient. If he makes an examination of the patient, with her knowledge and consent, *she believing that the examination is being made for the purpose of treating her,* then the relation is created by implication, and it is wholly immaterial what the secret object or purpose of the physician was in making it; and in the absence of evidence to the contrary, the plaintiff had the perfect right to assume and rely upon the assumption that the physicians who were apparently in charge of the hospital were rightfully there, and, as such, had the authority to examine and prescribe for her, and he will not afterwards be heard to say he was not connected with the institution and had no authority to examine or treat her. If such a thing as that could be done, then the privilege accorded the patient could be taken from her by trick or fraud.' " (Italics ours.)

See annotation, 22 A. L. R. 1217: "Competency of hospital physician or attendant to testify as to condition of patient."

The statutes under consideration do not state or imply that the created privilege may be withheld from a patient confined in a public mental hospital.

The opinion in *Taylor v. United States,* 222 F. (2d) 398 (CADC; 1955), fortifies our conclusion that the court erred in admitting Dr. Vanderwielen's testimony of state-

ments defendant made to him during the extended period of the psychiatric examination and treatment.

Defendant Taylor was indicted for robbery; found to be mentally incompetent; and committed to a hospital. Later, it was certified that he was mentally competent to stand trial.

At the time of trial, the Code of the District of Columbia contained a privilege statute similar to ours.[1]

The hospital-staff psychiatrist, who had had five recorded psychiatric interviews with the defendant during his confinement, was called to the stand by the prosecution. The Court of Appeals held this to be error, saying:

"In regard to mental patients, the policy behind such a statute is particularly clear and strong. Many physical ailments might be treated with some degree of effectiveness by a doctor whom the patient did not trust, but a psychiatrist must have his patient's confidence or he cannot help him. 'The psychiatric patient confides more utterly than anyone else in the world. He exposes to the therapist not only what his words directly express; he lays bare his entire self, his dreams, his fantasies, his sins, and his shame. Most patients who undergo psychotherapy know that this is what will be expected of them, and that they cannot get help except on that condition. . . . It would be too much to expect them to do so if they knew that all they say—and all that the psychiatrist learns from what they say—may be revealed to the whole world from a witness stand.'[2]

---

[1]D.C. Code 1951, § 14-308, 29 Stat. 138. " 'In the courts of the District of Columbia no physician or surgeon shall be permitted, without the consent of the person afflicted, or of his legal representative, to disclose any information, confidential in its nature, which he shall have acquired in attending a patient in a professional capacity and which was necessary to enable him to act in that capacity . . .' " *Taylor v. United States*, 222 F. (2d) 398, 401 (1955).

We are aware that the statute contains the following proviso:

". . . *Provided*, That this section shall not apply to evidence in criminal cases where the accused is charged with causing the death of, or inflicting injuries upon a human being, and the disclosure shall be required in the interest of public justice: . . ." D.C. Code 1961, § 14-308.

Since Taylor was not charged with ". . . causing the death of, or inflicting injuries upon a human being . . .", the proviso was not applicable. The statutes of Washington do not contain such a proviso.

" 'Presumably all of the patients in any good mental hospital are receiving psychiatric treatment. That is true of persons whether they are sent to St. Elizabeths Hospital as civil insane, as criminal insane, or as "sexual psychopaths." '[3]

"  . . .

"[2]Guttmacher and Weihofen, Psychiatry and The Law (1952), p. 272.

"[3]Winfred Overholser, Superintendent of St. Elizabeths, 'Some Problems of the "Criminal Insane" at Saint Elizabeths Hospital', Med. Ann. of D. C., Vol. XXII, p. 349, July 1953." (p. 401)

Finally, we have heretofore noted that defendant was sent to Northern State Hospital upon petition of her counsel, Mr. Conroy. On cross-examination, defendant testified:

"Q. Then you don't remember seeing Mr. Conroy from that day until you saw him—when was that? A. He [Mr. Conroy] was up one day at Northern State, *and told me to tell the doctor everything so that they could help me.*" (Italics ours.)

In circumstances somewhat similar to the instant case, the Supreme Court of New Jersey, in *State v. Hunt,* 25 N. J. 514, 533, 138 A. (2d) 1 (1958), said:

" . . . Within the holding of Kociolek [23 N. J. 400, 129 A. (2d) 417 (1957)], the admissions made by the defendant to the doctors *obtained by application of his counsel* were as privileged as if they had been made directly to his counsel." (Italics ours.)

In view of our conclusion that Dr. Vanderwielen's testimony is within the ambit of the doctor-patient privilege[2], we do not deem it necessary to discuss the thesis of the *Hunt* case, *supra.*

The judgment and sentence, from which this appeal is prosecuted, is reversed, and the case is remanded to the superior court for a new trial.

FINLEY, C. J., HILL, ROSELLINI, and FOSTER, JJ., concur.

---

[2]See Ops. Atty. Gen. 1945-46, p. 217—State psychiatrist's privileged consultation.