[No. 26027–8–I. Division One. July 1, 1991.]

SEATTLE NORTHWEST SECURITIES CORPORATION,
*Respondent,* v. SDG HOLDING
COMPANY, INC., ET AL,
*Appellants.*

*Christopher R. Osborn, Stephan J. Francks, Christopher J. Soelling,* and *Short, Cressman & Burgess,* for appellants.

*David F. Jurca* and *Helsell, Fetterman, Martin, Todd & Hokanson,* for respondent.

AGID, J.—Appellants challenge the trial court's order of contempt and entry of default judgment as sanctions for failure to comply with orders for discovery of documents and testimony which appellants claim are privileged. We

agree that, on the record before us, appellants' claims of attorney–client privilege are valid. We therefore reverse the trial court's order of contempt and entry of default judgment and remand to the trial court for further proceedings in accordance with this opinion.

I

Appellant SDG Holding Company, Inc. (SDG) is the successor in interest to SNW Enterprises, Inc., the former parent company of the former Seattle Northwest Securities Corporation. Appellants Donald Morken and Richard McLean are the officers, directors, and owners of SDG. In 1982, pursuant to a business transfer agreement (the Agreement), SNW Enterprises agreed to sell the former Seattle Northwest Securities Corporation to New SN Securities Corporation, a new corporation formed by SNW Enterprises' minority stockholders. New SN Securities then changed its name to Seattle Northwest Securities Corporation (SNW), the plaintiff/respondent in the present case.

Anticipating that legal claims might be made against the former entity, the Agreement provides in pertinent part that:

Sec. 4.1

(c) Any claim or liability arising out of the business or connected with the assets of either Seattle–Northwest, Seller, or SDG, as a result of event [*sic*] occurring prior to May 1, 1982, . . . shall be borne seventy–five percent (75%) by Seller [SDG] and twenty–five percent (25%) by Purchaser [SNW], provided that such claim or liability is asserted within three years of the date of this Agreement, and provided, further, that in no event shall Seller's liability hereunder for any claims or liabilities arising out of the securities business or connected with the assets of Seattle–Northwest exceed the aggregate sum of $2,475,000 . . ..

Sec. 4.2

(c) . . . The party which, pursuant to Section 4.1, is responsible for the greater proportion of the potential liability resulting from such claim shall be responsible for defending the same; . . . the defending party may proceed in such manner as it deems appropriate to either defend or compromise the claim, without further participation or interference in the proceedings by the other party, which party shall be deemed to have waived

any objection it may have had to any liability ultimately asserted against it as a result of the other party's handling of the claim. If the parties cannot agree on a course of action with respect to any such asserted claim, the party wishing to resist or defend, provided its counsel can state in writing that there is a [sic] least a reasonable possibility of successfully defending or resisting the claim, shall be entitled to control the disposition of the matter and shall, through counsel selected by it, proceed to resist or defend the claim in such manner as it deems appropriate; provided, however, that the other party may upon written notice at any time, by agreeing to assume all potential liability arising out of such claim, elect to take charge of the defense thereof, or to compromise or admit the same, in which event such party shall indemnify and hold harmless the other party from any liability with respect thereto and shall reimburse such other party for any costs theretofore incurred or expended by it in the defense thereof.

Shortly thereafter, in August 1983, the owners of the new SNW were notified that the lead underwriters for sales of WPPSS bonds had been named in several lawsuits concerning the bonds. This notification indicated that SNW was obligated to pay any share of liability plus legal fees required pursuant to an agreement between the former Seattle Northwest Securities Corporation and the underwriters. Within 10 days, SNW delivered a copy of the notification of the claim to SNW Enterprises, the forerunner of SDG, and formally requested that SNW Enterprises assume responsibility for defending the WPPSS claim pursuant to the provisions of the Agreement.

SDG hired the Davis, Wright law firm to represent SDG and SNW with respect to this claim, and later substituted George Greer of the Heller, Ehrman firm because of a conflict of interest on the part of Davis, Wright in the WPPSS litigation. Davis, Wright continued to represent SDG as general counsel and to provide advice regarding SDG's rights and obligations under the Agreement. However, in August 1987, allegedly at SNW's request that the Davis, Wright firm not be used at all because of potential conflicts, SDG retained John Burgess of Short, Cressman and Burgess. According to SDG, Burgess was retained solely for advice regarding SDG's rights and responsibilities under

the Agreement. SDG asserts that Greer of Heller, Ehrman, who was also counsel at this time, was counsel for the WPPSS claims.

In early August 1987, the principal underwriter defendants requested that SDG, as representative of SNW under the Agreement, participate in a settlement proposal to the WPPSS class plaintiffs. This offer was communicated to both SDG and SNW by a series of letters sent from Greer that explained the settlement offer and attempted to weigh the advantages and disadvantages of participation in the settlement proposal. In his letter on the subject dated August 31, 1987, Greer recommended acceptance of the offer, but indicated that this was not the only acceptable course of action and that the risk of a catastrophic judgment against SNW in favor of WPPSS plaintiffs was "remote".

On this same day, Burgess wrote Greer that SDG was not recommending acceptance of this settlement offer because of lack of SNW fault as well as available defenses. On September 1, 1987, Burgess also wrote a letter to James Robart, counsel for SNW, explaining that he believed that SNW had valid defenses, that "good faith" required a "reasonable possibility of successfully defending or resisting the claim", and that SNW could assume the defense of the action pursuant to the Agreement if it disagreed with his recommendation.

Apparently in response to this letter, Greer wrote Burgess and clarified that the lead underwriters indicated that the chances of their winning on summary judgment or winning a jury verdict were slim, even though there appeared to be no fault on the part of SNW. He specifically noted that the attorneys for the lead underwriters had not suggested that "there is at least a reasonable possibility of successfully resisting or defending the claim" of the WPPSS plaintiffs against them, and that he had not commented on that issue either.

SDG continued to refuse to enter the settlement agreement, and SNW then entered into the settlement agreement on its own. SNW then sued SDG for damages, claiming that SDG had failed to give proper notice and to provide evidence of the reasonableness of its decision to pursue the case, and that it had acted in bad faith. SNW's theory of bad faith posits that SDG refused to enter into the settlement agreement in order to force SNW to assume responsibility for the defense, thereby allowing SDG, pursuant to section 4.2(c) of the Agreement, to avoid any liability to the WPPSS plaintiffs.

In June 1988, SNW made a motion to compel discovery of matters that SDG claimed were protected by the attorney–client privilege. Specifically, SNW wished to compel production of any legal opinions by Burgess regarding the advisability of settling the WPPSS litigation and any other documents relating to this decision. In a letter to the parties dated January 4, 1988, but apparently signed on January 4, 1989, the trial court granted this motion and ordered the defendants to promptly provide plaintiff with:

(a) Communications between defendants and Short, Cressman & Burgess pertaining in any way to defendants' decision not to participate in the settlement, and

(b) Work performed, analyses made, conclusions drawn, and recommendations made as to the "reasonable possibility" language in the Business Transfer Agreement which is the subject of this suit . . ..

The trial court also ordered and allowed the deposition of Burgess, but reserved ruling on the admissibility of the evidence at trial.

SDG then sought discretionary review of this interlocutory order in this court arguing that it was a violation of the attorney–client privilege. This request was denied. The Washington Supreme Court Commissioner then affirmed this denial, and a motion to modify this ruling before the Supreme Court was denied.

In spite of these rulings, SDG did not produce the requested documents and was held in contempt by the trial court on March 26, 1990. Pursuant to CR 37, the trial court

then entered the sanction of default on all claims to which the requested material is relevant. The sanction was stayed on SDG's motion pending this appeal.

## II

Appellants challenge the contempt order by claiming that the order of discovery of specific documents and the deposition of Burgess were improper since they violated the attorney–client privilege. Before we examine the issues of attorney–client privilege, however, we first address respondent's contention that a civil contempt proceeding is not appealable, or at least not appealable on these grounds.

### A. Is the Contempt Ruling Appealable?

Contempt decisions are appealable pursuant to applicable court rules. RCW 7.21.070. Respondent claims that applicable court rules do not allow this appeal at the present time.[1]

Under the applicable court rule, RAP 2.2, a finding of civil contempt is appealable only if it is a final judgment, a decision affecting a substantial right which determines an action, or a final order made after judgment which affects a substantial right. RAP 2.2(a)(1), (3), (13). Relying upon the case of *Arnold v. National Union of Marine Cooks & Stewards Ass'n*, 41 Wn.2d 22, 246 P.2d 1107 (1952), appellants argue that this case is a final judgment pursuant to RAP 2.2.[2]

---

[1] In a footnote in their reply brief, appellants contend that the respondent should not be allowed to raise this issue since it originally stipulated to and sought discretionary review of the trial court's decision to order production of the documents. However, appellants do not make a specific estoppel argument nor do they cite any authority which would show that respondent cannot assert this argument at this time.

[2] At the time *Arnold* was decided, a somewhat different statute governing interlocutory review of contempt judgment, RCW 7.20.140, was in effect. RCW 7.20.140 provided in pertinent part that either party in a contempt action could "appeal therefrom in like manner and with like effect as from judgment in an action". Although the language of the statute is somewhat different from that of RAP 2.2, as noted above, it was only effective to the extent that contempt decisions were final. *Arnold*, 41 Wn.2d at 26; *see also Boudwin v. Boudwin*, 162 Wash.

In *Arnold,* the Washington Supreme Court held that an adjudication of contempt is not appealable unless it is a final order or judgment. 41 Wn.2d at 26. The contempt judgment in that case was final because the contumacy (willful resistance to contempt order) of the appellant was established and because the sanction was a coercive one designed to compel compliance with the court's order requiring the defendant to produce certain bonds. *Arnold,* 41 Wn.2d at 26.

Applying this analysis to the present case, the trial court specifically found that appellants were willfully resisting the order to produce and that judgment would be entered as a sanction if SDG failed to comply with the order within 30 days. Therefore, contumacy and a coercive remedy exist, and under *Arnold,* the contempt judgment is final for purposes of appeal.

Respondent next contends that even if the contempt order is appealable, the appeal is limited to "jurisdictional issues". Specifically, respondent contends that the appellants can only appeal the court's power or jurisdiction to enter the order, not the validity of the order itself because even the invalidity of the order would not excuse the failure to follow a court order.

In general, a court order which is "merely erroneous" must be obeyed and may not be collaterally attacked in a contempt proceeding. *State v. Turner,* 98 Wn.2d 731, 738–39, 658 P.2d 658 (1983). However, contempt decisions can be challenged if the "court '"lacks jurisdiction of the parties or of the subject matter, or . . . lacks the inherent power to make or enter the particular order involved"'". *Turner,* 98 Wn.2d at 739 (quoting *Dike v. Dike,* 75 Wn.2d 1, 7, 448 P.2d 490 (1968)). This is because, if the court does not have jurisdiction or authority to enter the order, its decision is void. *Turner,* 98 Wn.2d at 739.

142, 298 P. 337 (1931). Thus, although the case was decided using a different statutory scheme, the *Arnold* decision's analysis of the finality of a contempt decision applies equally to review under the court rule.

The distinction between a decision that is merely "erroneous" and a judgment that is "void" was explored in some detail in the *Dike* case. 75 Wn.2d at 1. In that case, the court quoted approvingly the following language from *Robertson v. Commonwealth,* 181 Va. 520, 536, 25 S.E.2d 352 (1943), which is significant in our case:

> a void judgment should be clearly distinguished from one which is merely erroneous or voidable. There are many rights belonging to litigants—rights which a court may not properly deny, and yet if denied, they do not render the judgment void. Indeed, it is a general principle that where a court has jurisdiction over the person and the subject matter, no error in the exercise of such jurisdiction can make the judgment void . . .."

> . . . .
> The rule that an order directing a witness to answer questions or to produce documentary evidence in his possession, although erroneously made or entered, until reversed, must be obeyed, is subject to these exceptions:

> . . . .
> (2) A witness can not be compelled to divulge privileged matters which have been given to him in confidence.

*Dike,* 75 Wn.2d at 8–9.

The *Dike* court went on to hold that, if the attorney–client privilege were properly invoked by an attorney in the action below, "then appellant's refusal to disclose the information to the court did not constitute contempt and we must reverse the trial court's judgment." *Dike,* 75 Wn.2d at 10. Furthermore, because of the importance of protecting the attorney–client privilege and the difficulty in determining when it applies, the court recognized that even if the attorney–client privilege were later determined not to apply, a contempt judgment and its related sanctions could be overturned. *Dike,* 75 Wn.2d at 16; *see also State v. Sheppard,* 52 Wn. App. 707, 715–16, 763 P.2d 1232 (1988) (an attorney's refusal to answer questions based on a good faith interpretation of the attorney–client privilege requires that contempt sanctions be overturned pending compliance therewith).

Respondent contends that the present case is distinguishable from *Dike* and *Sheppard* because it involves a

contempt judgment against the client, not the attorney, and that the reasoning of *Dike* and *Sheppard* does not apply in such a case. Although the facts of *Dike* and *Sheppard* did involve the attorney's invocation of privilege, and not the client's, this is a distinction without a difference.

The court's decision in *Dike* was in large part based upon the statutory prohibition against requiring an attorney to divulge privileged information (*see* RCW 5.60:060(2)). *Dike,* 75 Wn.2d at 10; *see also Sheppard,* 52 Wn. App. at 709. However, the statutory rule is derived from the common law, and under the common law, the same privilege accorded to the attorney by statute is extended to the client as well. *State v. Emmanuel,* 42 Wn.2d 799, 815, 259 P.2d 845 (1953); *see also Victor v. Fanning Starkey Co.,* 4 Wn. App. 920, 921, 486 P.2d 323 (1971) ("It is clear that the same privilege accorded to the attorney is also granted to the client").

Even if the statute applies by its terms only to attorneys, an analysis of the policy behind the *Dike* decision establishes that the privilege should extend to the client as well. As stated by the *Dike* court:

> The purpose and justification for the attorney–client privilege has been explained as follows . . .:
>> To require the counsel to disclose the confidential communications of his client to the very court and jury which are to pass on the issue which he is making, would end forever the possibility of any useful relation between lawyer and client. It is essential for the proper presentation of the client's cause that he should be able to talk freely with his counsel without fear of disclosure. . . . [A]ny rule that interfered with the complete disclosure of the client's inmost thoughts on the issue he presents would seriously obstruct the peace that is gained for society by the compromises which the counsel is able to advise.

*Dike,* 75 Wn.2d at 10–11 (quoting H. Drinker, *Legal Ethics,* at 133 (1953)). Although this discussion is framed in terms of the attorney, society's interest in preserving an open and frank discussion between attorney and client would be compromised if the client were asked to divulge confidential information as surely as if an attorney were asked to

divulge such information. What good is the privilege if opposing counsel can simply subpoena the *client* and learn from him what could not be learned from the attorney?

Therefore, we hold that the validity of the contempt judgment against SDG can be reviewed and we may examine whether the invocation of the attorney–client privilege by SDG was proper.

### B. Attorney–Client Privilege

As noted above, RCW 5.60.060 prohibits disclosure of communication between an attorney and a client given in the course of professional employment. This privilege also extends to written communications from an attorney to the attorney's client. *Kammerer v. Western Gear Corp.*, 96 Wn.2d 416, 421, 635 P.2d 708 (1981) (citing *Victor*, 4 Wn. App. at 920).

Respondent argues that the discovery sought is not privileged because of certain exceptions to the privilege rule or because of waiver. On the record before us, respondent's theories would not support an abrogation of the attorney–client privilege in the present case.

Respondent first contends that there is no attorney–client privilege to be asserted against SNW because Burgess was the attorney for both parties. Appellants are correct that the attorney–client privilege does not apply between parties when the attorney has acted for their mutual benefit. *Billias v. Panageotou*, 193 Wash. 523, 526, 76 P.2d 987 (1938). However, the facts in the record before us do not support this contention.

Burgess was employed by SDG as an attorney at the same time as Greer of the Heller, Ehrman firm. Greer was already actively representing SDG and SNW with respect to the WPPSS litigation. There is no evidence that Burgess was at any time representing SNW, thus lending credence to SDG's claim that Burgess was hired by SDG for general legal advice, including advice on its responsibilities under the Agreement with SNW, while Greer handled responsibilities for both parties in the WPPSS litigation. Burgess'

analysis of SNW's chances of defending the WPPSS suit and advice to SDG on the settlement are consistent with SDG's assertions concerning his role because such an analysis would be necessary in order to advise SDG on its responsibilities under the Agreement.

Furthermore, there exists no evidence on the record nor is it alleged that Burgess acted for the benefit of both of the parties in the same way as the attorney in *Billias*—that is, as an attorney in active discussions with both parties about the issue concerning the documents sought to be protected. Instead, in this case, a review of Burgess' correspondence regarding the defense of the WPPSS claims indicates his representation of SDG, acknowledges the opinions of Greer as separate counsel, and refers several times to SDG's rights and positions under the Agreement. Both the content and tone of the correspondence indicates that he was not acting for the mutual benefit of the parties, at least with reference to the WPPSS defense.

Similarly, the record before us does not support respondent's contention that, because there is a fiduciary relationship owed by SDG to SNW in defending the WPPSS claims, there is no attorney–client privilege. Although there is some authority from other jurisdictions that in the presence of a fiduciary relationship, the attorney–client privilege cannot be invoked against the beneficiary with respect to issues concerning that relationship (*see Quintel Corp., N.V. v. Citibank, N.A.,* 567 F. Supp. 1357, 1360–63 (S.D.N.Y. 1983)), respondent has not demonstrated the existence of a fiduciary relationship.

Under Washington law, "participants in a business transaction deal at arm's length." *Liebergesell v. Evans,* 93 Wn.2d 881, 889, 613 P.2d 1170 (1980). However,

> [a] confidential or fiduciary relationship between two persons may exist either because of the nature of the relationship between the parties historically considered fiduciary in character; *e.g.,* trustee and beneficiary, principal and agent, partner and partner, husband and wife, physician and patient, attorney and client; or the confidential relationship between persons involved may exist in fact.

*Liebergesell,* 93 Wn.2d at 890 (quoting *McCutcheon v. Brownfield,* 2 Wn. App. 348, 356–57, 467 P.2d 868 (1970)). "Whether such a fiduciary relationship existed in fact in this case depends on the development of factual proof." *Liebergesell,* 93 Wn.2d at 891.

Respondent primarily contends that there is an "indemnity" portion of the Agreement wherein SDG agreed to assume part of the defense of claims against SNW. It asserts that this is the factual proof needed of a fiduciary relationship between SDG and SNW. However, respondent mischaracterizes the nature of the Agreement.

As noted by appellants, indemnification, as that term is normally used, contemplates an agreement whereby one party agrees to *fully* reimburse another party for claims against them. *See Reefer Queen Co. v. Marine Constr. & Design Co.,* 73 Wn.2d 783, 787, 440 P.2d 453 (1968). Contrary to respondent's assertion, the portion of the Agreement at issue here contemplates a partial "contribution", not an indemnification, and by its very nature anticipates an adversarial rather than fiduciary relationship between the parties.

Furthermore, the cases cited by respondent do not support the proposition that an indemnity agreement always gives rise to a fiduciary relationship. Those cases relied upon by respondent either concern a fact–specific fiduciary relationship or are insurance cases. Insurance contracts are often characterized as contracts of adhesion and, because public policy is concerned with the sophistication of insureds who enter into these contracts, our courts have determined that insurance contracts give rise to fiduciary relationships. *See Weber v. Biddle,* 4 Wn. App. 519, 525, 483 P.2d 155 (1971). Such concerns are not present where, as here, both parties are sophisticated entities which bargained over the terms of the contract between them and explicitly anticipated the presence of future adversarial interests. Therefore, respondent has presented no evidence

of any indemnification obligation creating a fiduciary relationship that would prevent the assertion of the attorney–client privilege.

We also reject respondent's contention that SDG waived any attorney–client privilege it may have had with Burgess by sending a letter to SNW's counsel stating that there was a reasonable possibility of successfully defending the claim. Respondent's theory is that the letter disclosed portions of the allegedly confidential documents, thus waiving the privilege.

The Second Circuit has held that the claim of attorney–client privilege is not consistent with selective disclosure of the privileged documents when the "claimant decides that the confidential materials can be put to other beneficial purposes." *In re John Doe Corp.,* 675 F.2d 482, 489 (2d Cir. 1982). In *United States v. Voigt,* 877 F.2d 1465 (10th Cir. 1989), the Tenth Circuit also held that a voluntary disclosure of the substance of the attorney–client privilege waives that privilege. Selective disclosure of a communication may also waive the privilege as to all related portions of the communication, particularly if the selective disclosure is used to gain a tactical litigation advantage. *United States v. Jones,* 696 F.2d at 1069, 1072 (4th Cir. 1982).

Burgess' letter to SNW, however, is not the type of disclosure envisioned by these rulings. Certainly it is not a disclosure of the bulk of privileged information which caused waiver in *John Doe Corp.* and *Voigt.* Furthermore, no "portions of legal opinions" of the scope found to constitute waiver in *Jones* were disclosed to SNW.

The statement that "strong and valid defenses are available to the [WPPSS] class plaintiffs' claims" found in Burgess' letter is at most a disclosure of a legal *conclusion,* not a confidential legal opinion. If such a disclosure did waive the attorney–client privilege, every letter an attorney writes to opposing counsel, an audit firm, or a witness in a case could be construed as waiving the privilege. To penalize a disclosure of a legal conclusion by characterizing it as a waiver would greatly hamper attorneys in their ability to

effectively represent and advise their clients. The exception would swallow the rule and render the privilege a virtual nullity. We conclude that no partial disclosure of confidential materials sufficient to constitute a waiver of the attorney–client privilege occurred in the present case.

■ Relying upon *Escalante v. Sentry Ins. Co.*, 49 Wn. App. 375, 743 P.2d 832 (1987), *review denied*, 109 Wn.2d 1025 (1988), respondent also contends that the attorney–client privilege cannot be asserted when allegations of bad faith are at issue in the case. In *Escalante*, the Court of Appeals held that the attorney–client privilege is not to be invoked when the documents sought to be protected pertain to present or future "fraudulent" conduct by an insurer. *Escalante*, 49 Wn. App. at 394. The court established a 2–pronged analysis for determining whether fraudulent conduct exists which is sufficient to vitiate the privilege. First, the court must determine whether there was a factual showing

> adequate to support a good faith belief by a reasonable person that wrongful conduct sufficient to invoke the . . . fraud exception . . . has occurred.

*Escalante*, 49 Wn. App. at 394 (quoting *Caldwell v. District Court*, 644 P.2d 26, 33 (Colo. 1982)). If so, the documents are subject to an in camera inspection to determine whether there is a foundation in fact sufficient to waive the privilege based upon "civil fraud". *Escalante*, 49 Wn. App. at 394.[3]

The record before the court at this time is not sufficient to support respondent's allegations of bad faith conduct. SNW characterizes SDG's decision to continue defending the suit as absurd, therefore arguing that it was made only

---

[3]Contrary to appellants' assertion, RCW 48.01.130, which requires good faith dealing in all insurance matters, does not limit the holding of the *Escalante* case to questions of bad faith on the part of insurers. Although the court cited this statute in the opinion, it was in relation to the issue of whether a cause of action exists against the insurer for the bad faith handling of a claim. The existence of a "bad faith" cause of action is not at issue before this court. We address only the issue of whether, in the presence of such a claim, a waiver of the attorney–client privilege is required.

to force SNW to assume the total cost of settlement under the Agreement. This court is not convinced at this stage that, even if this allegation were true, it would demonstrate bad faith.

 Simply using the mechanisms provided in a contract to a party's best advantage is not bad faith on its face. Thus, even if SDG manipulated the situation by refusing the settlement offer and requiring SNW to make a "Hobson's choice" of defending or absorbing the entire settlement agreement, that may simply be what the parties bargained for. Without more evidence concerning the circumstances surrounding the formation of the contract, we cannot infer bad faith from a decision to take advantage of the rights an arm's-length contract gives to one party. Furthermore, the evidence is not overwhelming at this point that the decision to continue to defend the action was not a viable option. Apparently Greer and others concurred that "strong and valid defenses" were available.

However, we also cannot conclusively determine that respondent's allegation of bad faith has no merit. We therefore remand this issue for a hearing to determine whether there is sufficient basis for good faith belief by a reasonable person that SDG may have acted in bad faith. *See, e.g., Olson v. Haas,* 43 Wn. App. 484, 488, 718 P.2d 1 (1986). If the trial court finds that such a preliminary showing has been made, that court should then order an in camera inspection of the documents to decide if the bad faith claim is supported by the documents before allowing discovery. *See Escalante,* 49 Wn. App. at 394.

Similarly, there must be a remand for a factual hearing before permitting any discovery of privileged materials on respondent's two remaining theories. Respondent contends that the attorney–client privilege does not exist in the present situation because the opinion and supporting documents at issue were sought for the purpose of disclosure to others, specifically to satisfy SDG's obligation under the Agreement that its "counsel state in writing" that continued defense of a suit is a reasonable course of action.

▮▮ The attorney–client privilege only applies to communications that are intended by the party to be confidential. *Ramsey v. Mading,* 36 Wn.2d 303, 312, 217 P.2d 1041 (1950); *see also State v. Sullivan,* 60 Wn.2d 214, 217–18, 373 P.2d 474 (1962). Therefore, if the communication is intended to be disclosed to others, it is not protected by the attorney–client privilege. *Sullivan,* 60 Wn.2d at 217–18.

However, whether SDG intended the requested communication to be disclosed to others requires a factual determination which we cannot make based on the language of the Agreement and the record before us. While respondent contends that the opinion as to the reasonableness of the settlement had to have been sought for disclosure to SNW, appellants claim that the opinion was sought "for the purpose of obtaining an opinion regarding its rights and duties under" the Agreement. They further assert that no opinion was required at all because the decision to defend and the judgment that there were "strong and valid defenses" available had been made long before Burgess was retained by SDG. The record contains no factual bases for resolving these claims, and we remand to the trial court for a factual determination on this issue. *See, e.g., Olson,* 43 Wn. App. at 488.

Respondent also contends that even if the attorney–client privilege would otherwise apply in this case, that SDG has affirmatively waived that privilege by injecting Burgess' opinion as an issue in the case.

▮▮ The attorney–client privilege is waived when:

(1) assertion of the privilege was the result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense.

*Pappas v. Holloway,* 114 Wn.2d 198, 207, 787 P.2d 30 (1990) (citing *Hearn v. Rhay,* 68 F.R.D. 574 (E.D. Wash. 1975)).

In the present case, the respondent claims that SDG committed an affirmative act and put the information at

issue by counterclaiming that "defendants have complied with all conditions precedent to the commencement and maintenance of this action." Apparently, SNW reasons that such compliance requires the presence of an opinion letter by Burgess regarding advisability of settlement, and that this puts in issue the substance of the claimed privilege.

However, as we stated above, we cannot determine on the record before us whether the contract requires an opinion letter as alleged. It is true, as respondent argues, that if the Agreement requires a writing to justify defense of a claim at this stage, then the Agreement must contemplate something more than the conclusory statement given by Burgess in his letter to SNW. Otherwise, this portion of the Agreement would be meaningless. However, we cannot tell from the facts before us whether an opinion is required to *continue* defending a claim when the parties have already initially agreed to defend that claim. Under these circumstances, we do not know whether SDG will be required to come forward with evidence that would result in a waiver of the privilege in order to prevail on its counterclaim. Therefore, on remand, the trial court will need to resolve the factual issues necessary to interpret the Agreement on this issue. If the trial court decides that a writing was required to continue the defense of this case, it should enter narrowly tailored discovery orders to implement that decision.

On remand, appellants must also be required to elect whether or not they will call Burgess to offer testimony concerning the decision not to agree to the lead underwriter's settlement offer. If he so testifies, the attorney–client privilege will be waived as to that issue, and discovery of his testimony and supporting documents should be allowed. Under Washington law, a stipulation that an attorney's testimony may be offered at trial waives the attorney–client privilege with respect to that attorney. *Kammerer v. Western Gear Corp.*, 96 Wn.2d 416, 420, 635 P.2d 708 (1981). The waiver "cannot be delayed until the trial itself." *Kammerer*, 96 Wn.2d at 420 (citing *Phipps v. Sasser*, 74 Wn.2d 439, 445 P.2d 624 (1968)).

Until now this rule has not been extended to require that a party elect whether or not it will offer testimony in order to avoid waiver of the attorney–client privilege. However, there are sound policy reasons to so require. As stated in CR 1, the rules are to be construed to secure "the just, speedy, and inexpensive determination of every action." Part of their purpose is to avoid "trial by ambush" and to require that parties cooperate by not frustrating the purposes of discovery. Allowing a party to sit on the fence and not specify whether a potential witness will testify in order to preserve the advantages of not testifying while enjoying the future possibility of allowing that testimony frustrates the other party's attempt to construct an adequate case.

Therefore, we hold that when a party is asserting the attorney–client privilege, that party must make an election prior to any deadline for completion of discovery as to whether or not the privilege will be voluntarily waived at trial and, if the privilege is to be waived, provide to opposing counsel a statement of the subject matter of the testimony. If SDG wishes to preserve the privilege during discovery, it cannot have it both ways. It must either choose to use or forgo Burgess' testimony in order to allow SNW to pursue discovery in a meaningful manner.[4]

## C. Scope of the Discovery Order

Even if one or more of respondent's contentions concerning the lack of attorney–client privilege were valid, this court would be forced to reverse the contempt judgment and sanctions against SDG because the discovery order now in effect is too broad. The court below not only ordered discovery of documents relating to the analysis of possible successful defenses; it also ordered discovery of all

---

[4]We note in passing that should SDG elect to call Burgess as a witness, the parties and the court will have to consider the impact of RPC 3.7 on the conduct of the case.

documents relating to SDG's decision to pursue the defense and to decline the settlement offer. None of respondent's theories alleging abrogation of the attorney–client privilege would support an order of this breadth.

For instance, though SNW alleges that Burgess was representing both SDG and SNW with respect to the WPPSS claims due to the indemnitor–indemnitee relationship, this relationship would obviously not apply to all discussions between Burgess and SDG regarding SDG's decision not to participate in the settlement since certain of these discussions were assertedly based upon Burgess' advice regarding SDG's responsibilities under the Agreement. Similarly, even if the parties were in a fiduciary relationship, the relationship would only arise from the factual context of SDG's representation of SNW in the WPPSS litigation and would not apply to all communications regarding SDG's decision not to participate in the settlement offer.

Neither would the legal opinion exception or waiver justify such broad discovery. Even if SDG sought a legal opinion regarding the reasonableness of pursuing litigation only to disclose that opinion to SNW, it certainly did not initiate all communications with Burgess regarding SDG's rights and responsibilities under the Agreement for the same reason. Furthermore, SNW alleges waiver based upon the possibility that Burgess may testify at trial. If Burgess were to testify at trial regarding the reasonableness of the decision to continue litigation or if a waiver were found from SDG's assertion of a counterclaim, the privilege would still be applicable to other communications between Burgess and SDG regarding SDG's rights and responsibilities under the Agreement. These were neither discussed in the legal opinion sought by SDG nor required of SDG under the Agreement.

SNW contends that the discovery order must be this broad because its allegations of bad faith concern not only

Burgess' conclusion regarding the instant litigation but also discussions between Burgess and SDG regarding its responsibilities under the Agreement. However, even if SNW makes the initial showing of bad faith on remand, the trial court must first conduct an in camera review of the documents before deciding whether to allow discovery. *See Escalante,* 49 Wn. App. at 394. In the course of that review, the trial court will need to determine whether an order limited to communications regarding the analysis of a "reasonable possibility" of continuing the litigation is sufficient. If the trial court finds some evidence that SDG's decision not to participate in the settlement was made in bad faith and not simply as an exercise of SDG's rights under the Agreement, or if the scope of Burgess' testimony is not limited to his opinion on the viability of defending the case, a broader order will be necessary. We leave it to the trial court's discretion to determine the scope of any discovery order entered after resolution of the issues outlined in this opinion.

In conclusion, respondent has set forth no theory regarding the abrogation of the attorney–client privilege which would support the trial court's order of contempt and entry of judgment by default. Our examination of the record before us indicates no merit in respondent's argument that Burgess was representing SNW and SDG, that use of the attorney–client privilege is warranted by any fiduciary relationship, or that Burgess waived the privilege by disclosing his conclusion to SNW that the action against them could be successfully defended. As to respondent's other contentions, we do not have a sufficient factual record before us to conclude that they justify an order allowing discovery of the privileged documents or testimony. Therefore, we

reverse the judgment and remand to the trial court for disposition consistent with this opinion.[5]

FORREST and KENNEDY, JJ., concur.

---

[5]Respondent also requests an award of attorney fees for defending this appeal. Based upon our disposition of the appeal, attorney fees are not warranted in this case.