212 P.3d 579 (2009)
In the Matter of the ESTATES OF Harry Eugene SMALDINO and Leonard Smaldino, Deceased.
Howard Todd, Appellant,
v.
Bruce Moen, Personal Representative of the Estates, and Laurie Smaldino, Respondents.
No. 61421-5-I.
Court of Appeals of Washington, Division 1.
July 27, 2009.
*580 James Lobsenz, Carney Badley Spellman, Seattle, WA, for Appellant.
Howard M. Goodfriend, Edwards Sieh Smith & Goodfriend, Carol S. Vaughn, Suzanne C. Howle, Thompson & Howle, Robert J. Henry, Lasher Holzapfel Sperry & Ebberson PLL, Seattle, WA, for Respondents.
ELLINGTON, J.
¶ 1 This case involves a challenge to a finding of contempt for violation of a temporary restraining order. Howard Todd maintains he could not have intentionally disobeyed the order because he had not read it. He also contends the order did not comply with Civil Rule (CR) 65 and therefore violated due process, rendering it void. Todd was properly served with the order, however, and knowledge of its contents is imputed to him. The order did not comply in every respect with CR 65, but its faults did not render it void. We affirm.

BACKGROUND
¶ 2 Leonard Smaldino died intestate in July 2002. His sole heir was his father, Harry Smaldino, who was appointed personal representative of Leonard's estate. One week after Leonard's death, Harry suffered a major stroke, after which he required a live-in caregiver. Deborah Griswold, who had been Leonard's girlfriend, began caring for Harry. She became his attorney-in-fact under a durable power dated September 6, 2002. Harry died in 2004, leaving his estate to Griswold.
¶ 3 Leonard's and Harry's estates were consolidated and Griswold was appointed personal representative (PR) in both. Her attorney was Howard Todd.
¶ 4 Laurie Smaldino, Harry's other child, filed a will contest alleging undue influence by Griswold. Eventually Griswold and Smaldino reached an agreement under which they would divide the estate assets equally. Griswold agreed to resign as PR and provide an *581 accounting. Attorney Bruce Moen was appointed successor PR, although Griswold was not discharged. As partial distribution of her share of the estates, Moen deeded Griswold a parcel of real property in Kittitas County.
¶ 5 Issues soon surfaced about Griswold's management of the estates. She did not deliver all the assets to Moen. Nor did she provide an accounting. Eventually Moen brought claims against her for breach of fiduciary duty. The court ordered her to provide an accounting. She did not, and in June 2006, she was found in contempt. In December 2006, she was again held in contempt for breach of her fiduciary duty and failure to file an accounting.
¶ 6 In August 2007, the estates obtained a writ of attachment on properties owned by Griswold, including the Kittitas County property. Before the clerk could issue the writ, however, Griswold conveyed the property to her son.
¶ 7 The parties proceeded to trial. The court found that Griswold had not purged her contempt and had mismanaged the estates both before and after Harry died. Among other things, Griswold was unable to account for $110,000[1] in cash she admitted removing from Leonard's safe deposit box; misrepresented the amount for which Harry, with her help, sold his business; failed to account for the proceeds of the sale; and commingled estate assets with her own personal property.
¶ 8 On November 2, 2007, the court ordered Griswold to pay $448,809 to compensate the estates for missing assets, and $23,076 and $13,750 to the estates and Laurie Smaldino, respectively, for attorney fees incurred prior to trial.[2] The court authorized PR Moen to deduct the judgment amounts from Griswold's share of the estates and to pursue collection against her other assets as necessary to satisfy the judgment. Attorney Todd was present in court for these rulings. He advised Griswold of the judgment and referred her to bankruptcy counsel.
¶ 9 On November 6, 2007, counsel for Laurie Smaldino contacted Todd to schedule presentation of the final judgment. That same day, Todd wrote to Griswold and asked her to sign a promissory note for his outstanding fees, to be secured by a deed of trust on the Kittitas property "before Judge Hilyer enters judgment."[3] On November 10, Griswold's son reconveyed the property to her.[4]
¶ 10 On November 11, PR Moen was contacted by a real estate agent and learned that a sale was pending on the Kittitas property. Moen immediately obtained a temporary restraining order (TRO) prohibiting Griswold and her agents and attorneys from selling the Kittitas property or "transferring, assigning, removing, encumbering, changing title to, concealing or in any way disposing"[5] of any assets of the estates. The order set a show cause hearing for November 28.
¶ 11 The motion papers and TRO were delivered to Todd. Todd admits glancing at the papers, but denies reading them. He later explained he thought the papers simply gave notice of a motion and did not realize they included a TRO. Todd also stated he did not read the papers because he expected his representation of Griswold would soon end.
¶ 12 On November 19, Todd met with Griswold in Seattle. He gave her an envelope containing a copy of the TRO papers, but states they did not review them. Griswold signed a promissory note and deed of trust on the Kittitas property to secure Todd's unpaid fees. Later that day, Todd drove from Seattle to Kittitas County and recorded the deed of trust. On November 27, Griswold filed for bankruptcy.
*582 ¶ 13 Upon learning of the deed of trust, the PR asked the court to find Todd in contempt for violating the TRO. Todd resisted the motion on grounds he did not intentionally violate the order. He also argued the TRO failed to satisfy the requirements of CR 65(b) and was therefore void. The court rejected these arguments and issued a contempt order. Todd arranged for reconveyance of the property.
¶ 14 Todd appeals. He contends the court's finding that he did not read the TRO contradicts its conclusion that he intentionally disobeyed it. He further contends the order was void because it did not satisfy the requirements of CR 65(b); specifically, the requirements that the order identify the threatened injury and state why it is irreparable.

ANALYSIS

Propriety of Review
¶ 15 As a threshold matter, we must determine whether to entertain Todd's appeal. The order finding Todd in contempt was issued on December 14, 2007. The order permitted Todd to purge the contempt by asking the bankruptcy trustee to reconvey the deed of trust, imposed sanctions of $1,000 per day until he did so, and imposed attorney fees to be determined at a later time. Orders imposing fees and costs were entered on February 15 and March 3, 2008. On March 15, Todd filed a notice of appeal seeking review of the two judgments for fees and costs, but not the contempt order itself.
¶ 16 Under RAP 2.4(b), an appellate court will review an order not designated in the notice of appeal, including an appealable order, if it prejudicially affects the decision designated in the notice, unless the order appealed from is a judgment for attorney fees. Appeal from a fees judgment does not permit review of an earlier, otherwise appealable order unless a timely appeal is also taken on that order.
¶ 17 The estates contend Todd's claims are not subject to review because his arguments relate only to the contempt order, which was a final judgment appealable under RAP 2.2(a). Todd responds that the December 14 order was not a final, appealable order because it contemplated later determination of sanctions, to wit, possible daily financial sanctions and the award of fees.[6]
¶ 18 "An adjudication of contempt is appealable if it is a final order or judgment; i.e., the contumacy  the party's willful resistance to the contempt order  is established, and the sanction is a coercive one designed to compel compliance with the court's order."[7] The December 14 order established contumacy and imposed coercive sanctions. It thus appears to us to be a final order appealable under RAP 2.2(a).
¶ 19 But the trial court thought otherwise. Todd asked the court to certify the order as final under CR 54(b) so he could immediately appeal. The court denied the request because the estates objected. Todd contends the estates are therefore judicially estopped from raising the issue. We agree.
¶ 20 "`Judicial estoppel is an equitable doctrine that precludes a party from asserting one position in a court proceeding and later seeking an advantage by taking a clearly inconsistent position. . . . The doctrine seeks to preserve respect for judicial proceedings, and to avoid inconsistency, duplicity, and . . . . waste of time.'"[8] The estates' position on appeal is inconsistent with the position they took at trial.[9] They are therefore *583 judicially estopped from opposing review of the contempt order.
¶ 21 Further, the trial court essentially declared that the order was not final. It would hardly serve justice to fault Todd for not appealing at that point.

Contempt

A. Standard of Review
¶ 22 Whether contempt sanctions are warranted in a particular case is a matter within the discretion of the trial court.[10] Because Todd does not challenge the findings of fact, the question is whether the court abused its discretion by entering the contempt order based on those findings.[11] A ruling based on an erroneous view of the law or an incorrect legal analysis is necessarily an abuse of discretion.[12]

B. Intentional Disobedience
¶ 23 The trial court accepted Todd's explanations at face value and found that, although he glanced at the papers served upon him, he did not read the TRO. The court nevertheless concluded that Todd committed willful and intentional disobedience:
There is no question that Mr. Todd acted in defiance of the TRO by accepting the benefit, assisting and participating in the execution, and personally causing the recording of the Deed of Trust. A person is held to have intended the natural and probable consequences of his acts and in that sense Mr. Todd did act intentionally. Further, Mr. Todd acted willfully and intentionally when he elected not to read a TRO that was entered and served on him in a case where he was still attorney of record. Mr. Todd alleged no facts that would have rendered him unable to read or understand the TRO. The Court firmly rejects Mr. Todd's contention that a lawyer appearing in a case, who is thereby serving as an officer of the court, can escape the effect of a court order by not reading it, then seek to avoid it to secure a property interest for his own benefit. The violation of a court order without reasonable excuse is deemed willful. Mr. Todd's excuses for violating the TRO are not reasonable. Therefore, his violation of the TRO is deemed willful.[[13]]
Todd contends the court's conclusion that he intentionally disobeyed the TRO is contradicted by the finding that he did not read it.
¶ 24 Under the general contempt statute, RCW 7.21.010(1)(b), "contempt of court" is defined as "intentional . . . . [d]isobedience of any lawful judgment, decree, order, or process of the court."[14] Implicit in this definition is the requirement that the contemnor have knowledge of the existence and substantive effect of the court's order or judgment.[15]
¶ 25 But knowledge does not necessarily mean actual knowledge. Under CR 65(d), a person who is properly served is deemed to have knowledge: "Every order granting an injunction and every restraining order . . . is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise."[16] The case law is in accord.[17]
*584 ¶ 26 A different rule would allow a person to avoid the force of a restraining order simply by claiming that although he had the order in hand, he did not examine it. Such a rule would make all such orders useless.
¶ 27 Todd does not deny he was personally served with the TRO. He is therefore charged with knowledge of its prohibitions. Todd's acquisition of a security interest in the Kittitas County property was an intentional act. His act of disobedience of the order was therefore intentional, and the court did not err in so concluding. There was no abuse of discretion in the finding of contempt.

C. Flaws in the TRO
¶ 28 In general, a court order that is "merely erroneous" must be obeyed and may not be collaterally attacked in a contempt proceeding.[18] A void order, however, may be attacked at any time.[19] The further question here is whether imperfections in the temporary restraining order render it void.
¶ 29 Where a court lacks jurisdiction over the parties or the subject matter, or lacks the inherent power to make or enter the particular order, its judgment is void.[20] But where the court has personal and subject matter jurisdiction, a procedural irregularity renders a judgment merely voidable, not subject to collateral attack.[21] Here, the court lacked neither jurisdiction nor power to act.
¶ 30 Todd nonetheless contends the order is void because it does not contain every feature required by the governing rule and therefore violates due process.
¶ 31 Ex parte TROs are governed by CR 65(b):
A temporary restraining order may be granted without written or oral notice to the adverse party or his attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting his claim that notice should not be required. Every temporary restraining order granted without notice . . . shall define the injury and state why it is irreparable and why the order was granted without notice; and shall expire by its terms within such time after entry, not to exceed 14 days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period or unless the party against whom the order is directed consents that it may be extended for a longer period.[[22]]
¶ 32 The first sentence in CR 65(b) sets forth the prerequisites for issuance of a TRO without notice (to wit, the showing of immediate need and inability to give timely notice). As early as 1900, the Washington Supreme Court held in In re Groen[23] that these prerequisites exist to ensure that parties are afforded minimum due process protections:
Due process of law, orderly procedure, and a decent regard for the rights of individuals, alike require the giving of notice *585 and an opportunity to be heard; and to depart from this universally recognized principle in a case presenting no emergency is to disregard the plain provisions of the statute . . . and a principle as old as the law itself.[[24]]
An ex parte TRO issued absent necessity and without provision for notice and opportunity to be heard is therefore void: "[I]n granting the injunction without notice, and without any showing of necessity therefor, and in failing to make any provision for notice and an opportunity for hearing, the court exceeded its powers, and the petitioner is entitled to his discharge."[25]
¶ 33 The United States Supreme Court said much the same in Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County,[26] the "stringent restrictions imposed [by Federal Rules of Civil Procedure Rule 65(b)] on the availability of ex parte temporary restraining orders reflect the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute."[27]
¶ 34 Todd does not challenge these aspects of the order. Rather, his argument rests upon the second sentence of CR 65(b), which mandates certain content for the order itself, including a requirement that the order identify the threatened injury and state why it is irreparable. As Todd points out, the TRO here did not contain such a statement.[28]
¶ 35 Todd brings to our attention cases from Hawaii and Colorado holding that if an ex parte TRO does not satisfy the facial requirements of CR 65(b), it violates due process and is void. In Renner v. Williams,[29] decided in 1959, the Colorado Supreme Court set aside a contempt order, holding that the underlying ex parte restraining order was "completely devoid of virtually all of the requirements of [Colorado Rule of Civil Procedure] 65(b), (c), and (d)."[30] The order did not set a time for its expiration or a date for hearing, did not define the injury or state why it was irreparable, did not give the reason for issuance without notice, and did not require any security. The court stated, without elaboration, citation or analysis, that "[a]ny one of the deficiencies noted was sufficient to render the order a nullity."[31] The only discussion in the opinion, however, related to case authority that failure to require the giving of security renders an ex parte order void.
¶ 36 In 1966, in Intermountain Rural Elec. Ass'n., Inc. v. District Court of Fourth Judicial District,[32] the Colorado Supreme Court struck down an ex parte order restraining construction of an electrical transmission station, saying the order suffered from "[e]very deficiency noted in the restraining order in the Renner case."[33] Again, the opinion contains no discussion.
¶ 37 In a case involving a contract dispute between race track owners and boycotting dog owners, the Colorado Court of Appeals quoted the broad language of Renner and Intermountain to reverse findings of contempt where the ex parte orders did not define the injury or state why the injury would be irreparable.[34]
*586 ¶ 38 In Wahba, LLC v. USRP (Don), LLC,[35] the Hawaii Supreme Court relied upon the Colorado cases in considering an ex parte TRO that exceeded the allowable scope of such an order and additionally failed to define the injury, state why it would be irreparable, or state why the order was issued without notice as required by Hawaii CR 65(b).[36] The court held:
[T]he fact that an "emergency" situation is involved does not excuse strict adherence to the requirements of [Hawaii Rules of Civil Procedure] Rules 65(b) and (d), because a TRO is such an extraordinary remedy. Therefore, these rules are not mere technical requirements, but must be adhered to scrupulously. The ex parte TRO accordingly was procedurally defective and, thus, void.[[37]]
¶ 39 In American Can Co. v. Mansukhani,[38] the Seventh Circuit came to a similar conclusion. There, a TRO was improperly issued ex parte (there was no proof that notice could not be given or that notice would have rendered fruitless the further prosecution of the action).[39] The order also failed to define the injury and state why it was irreparable or why the order was granted without notice. The court expressed its concerns about those requirements:
The specific requirements of Rule 65(b) are not mere technical legal niceties. They are strongly worded, mandatory provisions which should be respected. They are not meaningless words. A temporary injunction can be an extremely powerful weapon, and when such an order is issued ex parte, the dangers of abuse are great. Because our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute, the procedural hurdles of Rule 65 are intended to force both the movant and the court to act with great care in seeking and issuing an ex parte restraining order. This court has said that Rule 65(d) with its companion requirements is no mere extract from a manual of procedural practice. It is a page from the book of liberty. The same is true for the Rule 65(b) requirements for ex parte temporary restraining orders where the dangers of abuse are especially great.[[40]]
The court went on to rule that because the TRO did not comply with the requirements of the rule, it was "wrongfully issued."[41]
¶ 40 An ex parte restraining order is indeed a powerful weapon, to be issued rarely and with great caution. Such orders are in tension with a first principle of our jurisprudence: that court action should follow, not precede, notice and opportunity to be heard. As the court stated in Granny Goose, ex parte restraining orders should "be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer."[42] Due process requires a proper showing of emergent need for the restraint and a provision for immediate notice and early hearing.
¶ 41 We do not agree, however, that due process can be satisfied in every case only by perfect compliance with each and every requirement of CR 65(b). Neither the Supreme Court in Granny Goose nor our own court in Groen held that the formal requirements now expressed by the rule constitute minimum due process, and we have found nothing in the history of the rule to suggest such a reading.
¶ 42 As discussed above, some courts have so held. But most of those cases involved *587 TROs in which something fundamental to due process was missing. In the Hawaii case, the order exceeded the allowable scope of a TRO. In American Can, there was no proof notice could not be given and no showing of need to proceed ex parte. In Renner and Intermountain, the TROs did not even set a hearing date or require security. In Mile High Kennel, the only asserted injury was breach of contract.[43] Further, in each case it appears the TRO preceded any litigation.
¶ 43 Several of these cases recite that any deficiency as to the requirements of CR 65(b) will always render a TRO void. But we are unable to see why this should be so.[44] Procedural due process is contextual.[45] Here, context is crucial.
¶ 44 Griswold's improper handling of probate assets was the central subject of ongoing litigation. She had repeatedly frustrated the court's efforts to preserve the estate assets and had been twice held in contempt for defiance of the court. She had narrowly avoided the effect of a writ of attachment by means of a hasty conveyance to her son. She had just tried, once again, to remove the same property from the control of the probate court by arranging a sale to third parties.
¶ 45 The temporary restraint, by its clear terms, applied only to property subject to the probate court's control, and prohibited Griswold and her agents and attorneys from selling or encumbering the Kittitas property or other estate assets. On this record, there can be no question that both the nature of the alleged injury and the reason it was deemed irreparable were plainly apparent to Griswold and her attorney. We are unable to see how Todd was deprived of due process by the court's failure to spell out the obvious in its order.
¶ 46 Were Todd a stranger to this litigation, our answer would likely be different. Indeed, under other circumstances, as in the case of prelitigation restraining orders, due process may well require that every requirement of the rule be satisfied. But given the history of litigation here, the parties well knew the nature of the threatened injury and why it would be irreparable. Failure to so state in the order did not deprive Todd of due process.
¶ 47 The TRO was not void, and therefore no collateral challenge may be made by way of these contempt proceedings.
¶ 48 Affirmed.
WE CONCUR: GROSSE and AGID.
NOTES
[1] The court found her testimony as to the amount of missing funds not credible, given Griswold's numerous inconsistent representations and evidence that the box had contained $170,000.
[2] Determination of remaining fees was reserved for a later hearing.
[3] Clerk's Papers at 181-82.
[4] The court found, and Todd does not dispute, that Todd knew Griswold still controlled the property through her son.
[5] Clerk's Papers at 78.
[6] Todd also contends RAP 2.2(a) applies only to parties, and he was not a party below. We decline to address this argument.
[7] Wagner v. Wheatley, 111 Wash.App. 9, 15-16, 44 P.3d 860 (2002).
[8] Arkison v. Ethan Allen, Inc., 160 Wash.2d 535, 538, 160 P.3d 13 (2007) (alteration in original) (internal quotation marks omitted) (quoting Bartley-Williams v. Kendall, 134 Wash.App. 95, 98, 138 P.3d 1103 (2006); Cunningham v. Reliable Concrete Pumping, Inc., 126 Wash.App. 222, 225, 108 P.3d 147 (2005)).
[9] The estates' objection may have been directed toward the finality of a contempt order against Griswold, due to her pending bankruptcy. But the court told Todd it would not certify as final its order finding him in contempt because the estates objected, and the estates did not demur.
[10] Moreman v. Butcher, 126 Wash.2d 36, 40, 891 P.2d 725 (1995).
[11] Id.
[12] Dix v. ICT Group, Inc., 160 Wash.2d 826, 833, 161 P.3d 1016 (2007).
[13] Clerk's Papers at 222.
[14] The previous version of the general contempt statute defined "contempt" as "disobedience." Former RCW 7.20.010 (Laws of 1877, ch. 59, § 730), repealed by Laws of 1989, ch. 373, § 28. Todd devotes a significant part of his argument to various decisions, including In re Det. of Broer, 93 Wash.App. 852, 957 P.2d 281 (1998), allegedly showing this court's confusion as to the contempt definition at various times. The statutory language is clear, and we need not revisit those cases. Also, the trial court did not rely on Broer, and clearly said so.
[15] See In re Koome, 82 Wash.2d 816, 821, 514 P.2d 520 (1973).
[16] (Emphasis added.)
[17] See Koome, 82 Wash.2d at 820-21, 514 P.2d 520 (under former general contempt statute, knowledge of violated order or judgment may be either actual knowledge or supplied by personal service); State v. Mecca Twin Theater & Film Exchange, Inc., 82 Wash.2d 87, 93, 507 P.2d 1165 (1973) (corporate officer had knowledge of court order where he was personally served with a copy thereof; contempt sanctions were affirmed); City of Auburn v. Solis-Marcial, 119 Wash.App. 398, 401, 79 P.3d 1174 (2003) (knowledge of protection order issued under the Domestic Violence Protection Act, ch. 26.50 RCW may be either actual knowledge or supplied by personal service).
[18] Seattle Northwest Securities Corp. v. SDG Holding Co., Inc., 61 Wash.App. 725, 733, 812 P.2d 488 (1991) (citing State v. Turner, 98 Wash.2d 731, 738-39, 658 P.2d 658 (1983)).
[19] Turner, 98 Wash.2d at 739, 658 P.2d 658.
[20] Id.; State ex rel. Turner v. Briggs, 94 Wash. App. 299, 302-03, 971 P.2d 581 (1999).
[21] See Marley v. Dep't of Labor & Indus., 125 Wash.2d 533, 541, 886 P.2d 189 (1994).
[22] CR 65(b).
[23] 22 Wash. 53, 60 P. 123 (1900).
[24] Id. at 56, 60 P. 123.
[25] Id. at 54, 60 P. 123.
[26] 415 U.S. 423, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974).
[27] Id. at 439, 94 S.Ct. 1113. Because CR 65(b) was modeled on the federal rule, this court may look to federal decisions for guidance in construing it. See Bryant v. Joseph Tree, Inc., 119 Wash.2d 210, 218-19, 829 P.2d 1099 (1992).
[28] The order prohibits Griswold, her son, and their agents from disposing of any property distributed from the estates. It recites that the estates had shown a well-grounded fear of immediate invasion of a clear legal right and that actual harm would result if an injunction were not granted. A legal description was appended.
[29] 140 Colo. 432, 344 P.2d 966 (1959).
[30] Id. at 967.
[31] Id.
[32] 160 Colo. 128, 414 P.2d 911 (1966).
[33] Id. at 914.
[34] Mile High Kennel Club v. Colorado Greyhound Breeders Ass'n., 38 Colo.App. 519, 559 P.2d 1120, 1122 (1977).
[35] 106 Hawai`i 466, 106 P.3d 1109 (2005).
[36] The federal, Hawaii, Colorado and Washington CR 65(b) are, with one exception concerning the expiration of an ex parte TRO, nearly identical.
[37] Wahba, 106 P.3d at 1119 (citations omitted).
[38] 742 F.2d 314 (7th Cir. 1984).
[39] Id. at 322-23.
[40] Id. at 324-25 (citations omitted) (internal quotation marks omitted) (quoting Shannon v. Retail Clerks, Int'l Protective Ass'n, 128 F.2d 553, 555 (7th Cir.1942); H.K. Porter Co. v. Nat'l Friction Prods. Corp., 568 F.2d 24, 27 (7th Cir. 1977)).
[41] Id. at 325.
[42] Granny Goose Foods, 415 U.S. at 439, 94 S.Ct. 1113.
[43] See Corning & Sons, Inc. v. McNamara, 8 Wash.App. 441, 444-45, 506 P.2d 1328 (1973) (where prayer of complaint asks for nothing that would not be reduced to money judgment, there is no emergency justifying issuance of ex parte temporary restraining order).
[44] We note that the formal requirements for ex parte restraining orders vary considerably under other statutes, and we know of no cases holding those statutes violate due process. See, e.g., RCW 26.50.070(5) (an ex parte temporary order for domestic violence protection "shall contain the date and time of issuance and the expiration date and shall be entered into a statewide judicial information system by the clerk of the court within one judicial day after issuance").
[45] Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 13, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) ("axiomatic that due process `is flexible and calls for such procedural protections as the situation demands'") (quoting Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)); see also Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quantum and quality of process due depend upon what is needed to minimize risk of error).