# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| WASHINGTON STATE DEPARTMENT OF HEALTH; UMAIR A. SHAH, M.D., M.P.H., in his official capacity as WASHINGTON STATE SECRETARY OF HEALTH, | No. 58552-9-II |
| Respondent, | |
| v. | |
| DAYBREAK YOUTH SERVICES, a Washington non-profit corporation, | UNPUBLISHED OPINION |
| Appellant. | |

VELJACIC, A.C.J. — Daybreak Youth Services (Daybreak) seeks review of the trial court's temporary restraining order, contempt order, denial of reconsideration, and preliminary injunction. Daybreak argues the temporary restraining order (TRO) was void, and that the contempt order based on noncompliance with the TRO was erroneous. Daybreak also argues the TRO was impossible to comply with. Daybreak contends that the court's denial of reconsideration of the TRO and contempt order as well as its issuance of a preliminary injunction were also erroneous. Even if we assume without deciding that the TRO was valid, we reverse the contempt order because it was impossible to comply with the TRO. Since we reverse the contempt order, we do not address the denial of reconsideration. We also do not address the preliminary injunction as it is not a final order, and is, therefore, not appealable.

FACTS

I.    BACKGROUND

In 2022, Daybreak was a non-profit organization that provided inpatient and outpatient behavioral care services to youths with substance abuse and mental health issues. It operated two treatment facilities in Washington, one in Spokane and one in Brush Prairie.

A.    Notice of Intent to Suspend Daybreak's Licenses and Summary Suspension Orders

On August 1, 2022, the Washington State Department of Health (DOH) filed a notice of intent to suspend Daybreak's facilities' licenses to operate. In response, Daybreak appealed and requested an adjudicative proceeding before a health law judge.

In January 2023, a hearing date was scheduled for July 25-27, and a prehearing conference was set for May 19. On April 28, Daybreak filed a motion for summary judgment.

On May 9, before the scheduled preconference and hearing dates, DOH filed a prehearing memorandum stating that it intended to file amended notices of intent, and attaching 94 pages of additional exhibits that had not been previously disclosed in discovery. Daybreak then requested the discovery period be reopened and the hearing be continued to sometime in November.

But on May 19, DOH filed the amended notices of intent to suspend Daybreak's facilities' licenses.

Also, on May 19, DOH filed an ex parte motion for summary suspension of both of Daybreak's facilities' licenses before health law judges. In its motion, DOH alleged that Daybreak "failed to adequately address staff-to-patient boundary issues and other staff misconduct," failed to supervise and train staff, failed to cooperate, and "suppressed external reporting." Clerk's Papers (CP) at 288.

B.      Summary Suspension Orders, Requirements, and Events of May 25 through June 1

1.      Spokane Licenses Suspended

On May 25, a health law judge summarily suspended Daybreak's Spokane facility licenses.[1] Based on the allegations in the amended notice of intent to suspend and the motion for summary action, the health law judge found a "pattern of [Daybreak] failing to comply with its obligations to protect the rights, health, and safety of its vulnerable minor patient population," including failing to cooperate with investigations, failing to hire qualified staff, failing to provide adequate training and supervision, and failing to thoroughly investigate complaints regarding sexual misconduct and abuse. CP at 10. The health law judge found that these allegations were

> supported by the declarations of Emely Lee, Deborah Duke, Jessica Reiner, Jon Kuykendall, and Ian Corbridge, together with the attached exhibits, are of a nature that if proven at [a] hearing, would pose an imminent threat to the health, safety, and welfare of patients.

CP at 11.

> The health law judge concluded that

> [t]he Findings of Fact establish a rebuttable presumption that there is the existence of an immediate danger to the public health, safety, or welfare if [Daybreak] continues to operate . . . during the pendency of the resolution of the Amended Notice. This summary action is necessary to protect the public health, safety, and welfare.

CP at 12.

2.      Brush Prairie Licenses Suspended

Several significant events occurred on May 26.[2] On delegation from the Secretary of Health, another health law judge summarily suspended Daybreak's Brush Prairie facility licenses.

---

[1] For clarity, each facility had two licenses (four licenses total).

[2] This was the Friday of Memorial Day weekend.

That health law judge similarly found that Daybreak failed to protect patients' rights and obstructed regulatory oversight, which presented an immediate danger to the public, health, safety, or welfare. The health law judge's findings stated that

> [t]he evidence presented as part of the Notice, Motion, and Declarations with attached exhibits are of the nature that if proven at [a] hearing would pose a risk of imminent harm to the patients' health, safety, and welfare.

CP at 18. The health law judge concluded that

> [t]he Findings of Fact establish the existence of an immediate danger to the public health, safety, or welfare if [Daybreak] continues to operate a behavioral health agency during the pendency of the resolution of the Notice. This summary action is necessary to protect the public's health safety, and welfare.

CP at 18.

### 3. Requirements

Upon their issuance, both summary suspension orders were immediately stayed for four calendar days. *During these four days, over Memorial Day weekend*, the order required Daybreak to stop admission of new patients and "[s]afely and appropriately discharge or transfer all current patients." CP at 12, 19. Further, *within the first 24 hours* of the stay period, Daybreak had to develop and e-mail the director of the Office of Community Health Systems, Corbridge, a closure plan that contained the following:

> i. Information pertaining to the patient census, acuity (deidentified information on primary diagnosis) and payor mix in table format on the calendar day in which the Notice becomes a Final Order. For private pay patients (non-Medicaid or patients on Department of Children, Youth and Families contract), [Daybreak-Spokane and Brush Prairie] must provide a list of patient names, name and contact information of legal guardian(s), and insurance companies responsible for care, if applicable.
>
> ii. A plan for relocating patients ("Closure Transfer Plan") to appropriate care settings that offer similar services or services mandated based on court documents. The "Closure Transfer Plan" must take into consideration the most appropriate setting possible in terms of quality, services, and location, as available and determined appropriate by the patient care team after taking into consideration the patient's individual needs, choices, and interests. The plan must outline

transportation resources [Daybreak-Spokane and Brush Prairie] will use to support patient movement and identify facilities who have agreed to receive patients.

iii. A plan for notifying patients, patient guardians, patient families, any surrogate decision makers of the patient, and insurance company (if applicable) of the license suspension. Notification shall include the intent to transfer a patient to another care facility and the name, location, and contact information of the facility a patient is transferred to, if appropriate.

iv. A strategy for referring patients who receive outpatient care under the facility license to other appropriate outpatient settings.

v. A plan for the preservation and transfer of medical records.

CP at 12-13, 19-20.[3]

Also, on May 26, DOH mailed the ex parte summary suspension orders to Daybreak.[4] At 3:40 p.m., counsel for DOH e-mailed Daybreak and notified them of the ex parte summary suspension orders. At 4:00 p.m., DOH's counsel e-mailed Daybreak the notices of intent to suspend Daybreak's facilities' licenses. At 4:01 p.m., DOH counsel's paralegal sent an e-mail to Daybreak stating that the documents supporting the motions had been uploaded and a password to access the files would be sent to Daybreak after Daybreak e-mailed and verified receipt of the e-mail.

4.      Ex Parte TRO

At 5:57 p.m. on May 30 (the next business day after May 26), DOH's counsel e-mailed Daybreak's attorney to inform him that DOH was seeking an ex parte TRO against Daybreak that might be heard the next day in Thurston County Superior Court. Daybreak's counsel responded at 9:23 p.m.:

---

[3] The summary suspension orders for each Daybreak location were separate orders but the requirements for both were exactly the same. However, the suspension order for the Spokane facility was issued one day before the Brush Prairie suspension order.

[4] On May 27, Thomas Russell, Chief Executive Officer of Daybreak, received three large envelopes that were too large to fit inside his mailbox. The envelopes were left on the ground by the gate outside his home. Russell stated the envelopes that had the summary suspension orders in them contained 12-14 inches worth of documents.

Daybreak sent the attached civil case cover sheet, summons and complaint to the Clark County Superior Court clerk's office for filing today. Since Daybreak had only 1 court day to respond to the pleading filed and served on 5/26, our motion for TRO will [be] filed tomorrow morning. We believe venue is proper in Clark County, not Thurston. If you cho[o]se to proceed with the ex parte hearing tomorrow, please advise the Commissioner that Daybreak has filed in Clark County and contends venue resides there.

CP at 369. Daybreak did not simultaneously seek an emergency stay of the Department's suspension orders.

DOH's counsel responded on May 31 at 7:24 a.m.:

Thanks for sending this. If the Department proceeds this morning, I will let the Court know about this matter.

CP at 369.

At 8:00 a.m. on Wednesday, May 31, the day the summary suspension orders took effect, DOH filed the ex parte motion for a TRO to prohibit Daybreak from operating residential treatment facilities and behavioral health agencies in violation of the summary suspension orders and an order to show cause why a preliminary injunction should not be issued.

On June 1, the trial court granted the ex parte motion and order to show cause.

The trial court's findings of fact included that the summary suspension orders found that the "summary suspension was needed to protect the public health, safety, and welfare" and that the suspension orders were stayed for four days during which time Daybreak had to, "(a) stop all new admissions; (b) safely and appropriately discharge or transfer all current Daybreak patients; and (c) develop and provide a 'Closure Plan' to the Department by May 27, 2023." CP at 468. The court found that Daybreak did not develop such a plan and thereby violated the suspension orders. The court also found that Daybreak communicated to third-parties that it intended to remain open after the summary suspension expired on May 31; and that remaining open violated the suspension orders. The court further found that "[t]hese violations disrupt and detrimentally

impact the safe and appropriate transfer of Daybreak's patients, which creates an immediate and serious danger that must be promptly addressed." CP at 468.

The trial court concluded that

[t]here is an immediate and serious danger to residents that constitutes an emergency in this case because Daybreak is in violation of, and has threatened to continue to violate[] orders issued by the Secretary of Health . . . summarily suspending the . . . licenses of Daybreak's Spokane and Brush Prairie locations due to the existence of an immediate danger to the public health, safety, and welfare.

CP at 468-69.

That same day, DOH's counsel e-mailed Daybreak's counsel and stated:

I presented the state's ex parte motion for TRO on this morning's Thurston County ex parte calendar. . . . Because the presentation was ex parte, I was unable to provide the Court any information that was not in the motion we sent to you by e-mail on the evening of the 30th and served on Daybreak at its main office in Spokane, yesterday.

CP at 372. The court ultimately was not informed of Daybreak's filing in Clark County.

5.      Daybreak's Emergency Motion to Stay the TRO

Daybreak filed an emergency motion to stay the TRO. On June 7, the trial court granted Daybreak's motion and stayed the TRO. The order scheduled a hearing to address the motion for TRO, order to show cause, or motion for preliminary injunction on shortened time for June 9.

C.      Order of Contempt

In the meantime, on June 6, DOH filed a motion for order of contempt based on noncompliance with the TRO. In its motion for contempt, DOH stated that remedial sanctions were warranted because "[i]t is plainly within the power of Daybreak to stop operating." CP at 545.

In making its decision on the contempt motion, the trial court considered the June 13 declaration of Thomas Russell, Chief Executive Officer of Daybreak, who detailed how the summary suspension orders were impossible to comply with. Russell stated:

> Based on my 40-plus years of experience in the healthcare industry, I immediately recognized it would be impossible to comply with the terms of the summary action orders. In my experience, it would take weeks, not days, to accomplish these tasks, and could not be done over the Memorial Day weekend. At that point, I realized DOH had intentionally set up Daybreak to fail by imposing impossible requirements.

CP at 907.

> Russell also explained that in order to transfer patients to different facilities,

> Daybreak would need to assess the clinical needs of each patient, identify which alternative facilities offered services to meet the patient's needs, contact them to determine if they can take additional patients, contact the parents, guardian, probation officer or other responsible parties to obtain agreement for the transfer and arrange transportation to complete the transfer.

CP at 908.

> Russell further stated:

> Ninety-seven percent (97%) of the patients in our care on May 26 were receiving co-occurring care, meaning they were being treated for both substance use disorder and mental health conditions. The availability of co-occurring care for teens in Washington State is very limited. Of the six (6) alternative residential treatment facilities in this state, one (1) is not taking youth, one (1) only provides mental health care, three (3) provide very limited mental health services, and the remaining facility that offers "dual diagnosis" care often refers patients to Daybreak because they have greater mental health needs than that facility can treat. Daybreak works with these facilities on a regular basis, and like Daybreak, their intake staff is not available on weekends.
> . . . These alternative facilities conduct new patient intakes on weekdays. It was not possible to ascertain bed space and service availability over the Memorial Day weekend. For this reason alone, it was impossible to provide a "closure plan" to Ian Corbridge by Saturday, May 27th. It was literally not possible to even identify the availability of appropriate alternative treatment locations within 24 hours, let alone get the client and parental/guardian and/or probation officer approval of transfers over a holiday weekend and make travel arrangements by end of day on May 27.

CP at 908. Russell also explained that "[m]any of these patients are involved in the juvenile justice system and are in treatment as an alternative to detention." CP at 910. Therefore, juvenile probation officers would need to be consulted.

Russell's declaration also stated that Daybreak had been working on safely discharging its patients and it would no longer have patients at its facilities as of June 14, 2023. Russell also stated that he told all 130 Daybreak employees that all but a few would be laid off by the end of the week.

Meanwhile, at a hearing on June 9, the trial court orally reinstated the "stricken" TRO stating:

> I am going to reinstitute the [TRO] that I stayed in order to hear from both parties. It is appropriate under the law and given the current circumstances.
>      . . . .
> I'm not signing a new order. I'm reinstating the [TRO] that was previously imposed.

Rep. of Proc. (RP) (June 9, 2023) at 27-28.

In spite of Russell's declaration, on June 15, the trial court granted DOH's motion and found Daybreak in contempt of the TRO issued on June 1 and reinstated on June 9. The court found that

> [b]y continuing to operate a residential treatment facility and behavioral health agency in Spokane . . . and Brush Prairie . . . , Daybreak has failed or refused to perform an act that is within its power to perform.
>      . . . .
> Daybreak may purge its contempt by presenting evidence of compliance with the TRO. Such evidence shall include a sworn statement that Daybreak has ceased operating and will continue to cease operating [a residential treatment facility and behavioral health agency] at Spokane and Brush Prairie while its licenses are summarily suspended.

CP at 850-51.

Also at the June 9 hearing, after the trial court found Daybreak in contempt, Daybreak's counsel stated:

> What does the court expect Daybreak to do? It does not have any clients. It won't have any employees as of Friday. What is the court expecting Daybreak to do?
>
> THE COURT: I am expecting Daybreak to comply with the summary suspension and the terms of the [TRO].
>
> [DAYBREAK'S COUNSEL]: But they have complied. They have no clients. They're not operating a treatment facility, because to operate a treatment facility, you have to have clients. I have not heard the State make any request that Daybreak do anything. The one thing that Daybreak said it will do, it will provide the closure plan, but that could not be done until they have transferred all the clients. So I'm not—I remain unclear as to what the court expects Daybreak to do that it has not already done.
>
> THE COURT: I would encourage you to review the orders and confer with opposing counsel. Thank you. This court will be at recess.

RP (June 15, 2023) at 34-35.

On June 15, the trial court also issued an order confirming its June 9 oral reinstatement of the June 1 TRO and order to show cause. The order concluded that

> Daybreak's continued operation without valid licenses has or will result in substantial injury because Daybreak's continued operation poses a risk to the public health, safety, and welfare. . . . Plaintiffs have a plain legal right and duty to protect public health by summarily suspending residential treatment facilities and behavioral health agencies like Daybreak upon concluding continued operation poses an immediate threat to public health, safety, or welfare.

CP at 856.

D.      Denial of Reconsideration and Preliminary Injunction

On June 26, Daybreak filed a motion for reconsideration of both the TRO and the order of contempt pursuant to CR 59(a)(4), (7), and (9).

On July 21, the trial court denied Daybreak's motion for reconsideration and granted a preliminary injunction.[5] The court found that Daybreak continued to operate without valid licenses

_____

[5] The trial court also denied Daybreak's motion to dismiss.

until June 14.  The court concluded that "Daybreak's continued operation without valid licenses has or will result in substantial injury because Daybreak's continued operation poses a risk to public health, safety, and welfare."  CP at 1274.

In denying reconsideration, the trial court reviewed another declaration by Russell dated June 21 regarding compliance with the TRO.  In this June 21 declaration, Russell stated that when the motion for contempt was heard, Daybreak was "no longer operating as a residential treatment facility []or as a behavioral health agency at either location."  CP at 901 (emphasis omitted). Russell also stated Daybreak was in "full and complete compliance with the TRO."  CP at 901. However, the court did not address whether Daybreak had purged contempt.  The court hand wrote on the last page of the order denying reconsideration and granting the preliminary injunction:

> Daybreak requested that the court address whether contempt had been purged. Given the volume of matters before the court today, the issue of whether contempt had been purged was not addressed.

CP at 1275.

Daybreak appeals.

## ANALYSIS

Daybreak sought review of the trial court's TRO, contempt order, denial of reconsideration, and preliminary injunction.  Our court commissioner clarified what was appealable with the following order:

> Based on the parties' appealability responses, it appears that *appellant can appeal only the contempt order and the related reconsideration denial*.  Both parties agree these are appealable matters.  All other orders contained in the notice of appeal are not before the court on direct appeal.
>
> This court, however, recognizes that other decisions entered by the superior court may have affected the contempt decision, and this ruling is not intended to restrict any of appellant's arguments on appeal.  See generally RAP 2.4(b).  In the event respondent disagrees with the necessary scope of this court's eventual review of the contempt decisions, it may raise this argument in its response brief.

11

Commissioner's Ruling (Sept. 11, 2023) (emphasis added).

I.    TRO AND CONTEMPT ORDER[6]

In an effort to undermine the contempt order, Daybreak argues the TRO is void. Daybreak also argues the trial court erred in finding it in contempt when compliance with the TRO was impossible. However, regardless of the validity of the TRO, an issue we need not address, we agree that the contempt order was erroneous because it was impossible to comply with.

A.    Legal Principles

A contempt order is reviewed for abuse of discretion. *State ex rel. Shafer v. Bloomer*, 94 Wn. App. 246, 250, 973 P.2d 1062 (1999). "A trial court's finding of contempt will not be disturbed on appeal as long as it is supported by substantial evidence in the record." *In re Structured Settlement Payment Rights of Rapid Settlements, Ltd.*, 189 Wn. App. 584, 601, 359 P.3d 823 (2015).

Chapter 7.21 RCW sets forth a court's statutory contempt authority. *State v. Dennington*, 12 Wn. App. 2d 845, 852, 460 P.3d 643 (2020). Contempt of court includes "[d]isobedience of any lawful judgment, decree, order, or process of the court." RCW 7.21.010(1)(b).

The contempt statutes distinguish between remedial (or civil) sanctions and punitive (or criminal) sanctions for contempt of court. *In re Interest of Silva*, 166 Wn.2d 133, 141, 206 P.3d 1240 (2009). Remedial sanctions are "imposed for the purpose of coercing performance when the contempt consists of the omission or refusal to perform an act that is yet in the person's power to

---

[6] "'An adjudication of contempt is appealable if it is a final order or judgment; i.e., the contumacy—the party's willful resistance to the contempt order—is established, and the sanction is a coercive one designed to compel compliance with the court's order.'" *In re Estates of Smaldino*, 151 Wn. App. 356, 363, 212 P.3d 579 (2009) (quoting *Wagner v. Wheatley*, 111 Wn. App. 9, 15-16, 44 P.3d 860 (2002)). Because these conditions are satisfied here, the contempt order is reviewable as a final order under RAP 2.2(a).

perform." RCW 7.21.010(3). Punitive sanctions are imposed to punish past contempt of court to uphold the court's authority. RCW 7.21.010(2).

Under RCW 7.21.030(2), a court may find a person in contempt of court and impose a remedial sanction "[i]f the court finds that the person has failed or refused to perform an act that is yet within the person's power to perform." Inability to comply with an order is an affirmative defense to the imposition of remedial contempt, and a contemnor bears the burden of production and persuasion in presenting such a defense. *King v. Dep't of Soc. & Health Servs.*, 110 Wn.2d 793, 804, 756 P.2d 1303 (1988). "An order of remedial civil contempt must contain a purge clause under which a contemnor has the ability to avoid a finding of contempt and/or incarceration for non-compliance." *Bloomer*, 94 Wn. App. at 253.

B.      Analysis

Here, on June 15, the trial court found Daybreak in contempt of the June 9 TRO[7] because Daybreak failed to comply with the summary suspension orders quickly enough. The court found that "[b]y continuing to operate a residential treatment facility and behavioral health agency in Spokane . . . and Brush Prairie . . . , Daybreak . . . failed or refused to perform an act that is within its power to perform." CP at 850-51. This finding, however, is not supported by substantial evidence.

In entering its order of contempt, the trial court considered the Russell's declaration who detailed how the summary suspension orders were impossible to comply with. Russell stated that, based on his experience, compliance was impossible because the tasks would take weeks to accomplish and "could not be done over the Memorial Day weekend." CP at 907.

---

[7] The TRO was initially ordered on June 1 but then stayed by the trial court; it was eventually reinstated on June 9. For ease of discussion, we refer to it as the June 9 TRO or TRO.

13

Russell also explained that in order to transfer patients to different facilities, Daybreak would have to coordinate with patients, parents, guardians, and probation officers, identify which facilities were available to take new patients, and arrange transportation.

Russell stated that 97 percent of Daybreak's patients "were receiving co-occurring care" which meant they were receiving treatment for both mental health conditions and substance use disorder. CP at 908. He specified that "[t]he availability of co-occurring care for teens in Washington State is very limited." CP at 908. Russell also clarified that Daybreak works regularly with the limited number of facilities that provide these services and that their intake staff is unavailable on weekends so Daybreak could not determine which facilities had available space over Memorial Day weekend. Russell concluded that "[f]or this reason alone, it was impossible to provide a 'closure plan' to Ian Corbridge by Saturday, May 27th." CP at 908. He continued, "[i]t was literally not possible to even identify the availability of appropriate alternative treatment locations within 24 hours, let alone get the client and parental/guardian . . . approval of transfers over a holiday weekend and make travel arrangements by end of day on May 27." CP at 908.

Russell also explained that "[m]any of these patients are involved in the juvenile justice system and are in treatment as an alternative to detention." CP at 910. Therefore, juvenile probation officers would need to be consulted.

The trial court did not find that Russell's statements regarding the impossibility of the summary suspension orders were not credible. Further, there was no other evidence presented as to how the summary orders, which required Daybreak to transfer all of its patients over Memorial Day weekend, could be complied with in the timeframe set forth in the summary suspension orders. In its motion for contempt, DOH merely stated that remedial sanctions were warranted because "[i]t is plainly within the power of Daybreak to stop operating." CP at 545.

14

DOH's argument on appeal that Daybreak could have complied earlier because it eventually did later is unpersuasive because it fails to consider the time restraints imposed in the summary suspension orders and the TRO on the basis of those suspension orders. Closing down Daybreak was not impossible, the time frame within which DOH gave Daybreak to do so is what was impossible. Russell's detailed declaration supports the conclusion that Daybreak carried its burden of showing that the summary suspension orders and the TRO based on those orders were impossible to comply with in the timeframe provided. On the other hand, there is no evidence, not to mention substantial evidence, supporting the court's factual finding that Daybreak had the ability to comply.

Because RCW 7.21.030(2) gives the court authority to order contempt only insofar as a party fails to perform an act that is within its power to perform, Daybreak's inability to perform the acts ordered in the TRO within the timeframe provided are a complete defense to contempt. Therefore, the trial court abused its discretion in finding Daybreak in contempt of the TRO.

II.    DENIAL OF RECONSIDERATION

Daybreak argues the trial court erred in denying its motion for reconsideration of the TRO and contempt order. In light of our decision to reverse the contempt order, we do not address the denial of reconsideration.

III.    PRELIMINARY INJUNCTION

Daybreak argues the court erred in issuing a preliminary injunction after Daybreak had already shut down.

 "RAP 2.2(a) sets forth those superior court decisions from which a party may appeal as a matter of right." *In re Dependency of A.G.*, 127 Wn. App. 801, 805-06, 112 P.3d 588 (2005). The rule provides:

15

> **(a) Generally.** Unless otherwise prohibited by statute or court rule and except as provided in sections (b) and (c), a party may appeal from only the following superior court decisions:
>
> (1) *Final Judgment.* The final judgment entered in any action or proceeding, regardless of whether the judgment reserves for future determination an award of attorney fees or costs.

RAP 2.2(a)(1). "'An adjudication of contempt is appealable if it is a final order or judgment; i.e., the contumacy—the party's willful resistance to the contempt order—is established, and the sanction is a coercive one designed to compel compliance with the court's order.'" *In re Estates of Smaldino*, 151 Wn. App. 356, 363, 212 P.3d 579 (2009) (quoting *Wagner v. Wheatley*, 111 Wn. App. 9, 15-16, 44 P.3d 860 (2002)).

In contrast, "[a]n order granting a preliminary injunction is not a final order, nor a final determination on the merits of the case." *League of Women Voters of Wash. v. King County Records, Elections & Licensing Servs. Div.*, 133 Wn. App. 374, 385, 135 P.3d 985 (2006). Therefore, because the preliminary injunction is not final, it is not appealable and we decline to consider it.[8]

---

[8] Daybreak has also filed a motion for discretionary review under case number 58692-4-II. That matter has been stayed by our commissioner pending our decision in this case. *See* Ruling Staying Motion for Discretionary Review, No. 58692-4-II (Wash. Ct. App. Dec. 22, 2023). As we have concluded, the preliminary injunction is not appealable as of right, accordingly our commissioner will decide whether it may be reviewed on a discretionary basis.

CONCLUSION

We reverse the contempt order because compliance with the TRO within the timeframe required was impossible. We do not address the preliminary injunction or denial of reconsideration.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, A.C.J.

We concur:

Lee, J.

Glasgow, J.